Doris **STUEVE et al., Plaintiffs,**

v.

**AMERICAN HONDA MOTORS COMPANY, INC., and Honda Motor Company, L. T. D. of Japan, Defendants.**

**No. 77–4170.**

United States District Court, D. Kansas.

Sept. 15, 1978.

Jerry R. Palmer, Topeka, Kan., James L. Grimes, Jr., Topeka, Kan., for plaintiffs.

Donald Patterson, Topeka, Kan., for American Honda Motors Co.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a products liability action which comes before the Court upon various motions filed by defendants. Oral argument has been heard and the parties have submitted extensive briefs. The Court is prepared to rule.

Defendants American Honda and Honda Motor Company are the distributor and manufacturer, respectively, of Honda motorcycles sold in this country. Plaintiff Doris Stueve is the wife and administratrix of the estate of Frederick Duane Stueve, and brings this action for wrongful death and survivorship on behalf of herself, her children, and the estate of Frederick Stueve. The complaint in this case, filed August 24, 1977, alleges that on August 31, 1975, Frederick Stueve was riding a 1972 Honda motorcycle which collided with an automobile at an intersection in Topeka, Kansas. As a result of the impact, the motorcycle caught fire. On September 22, 1975, Frederick Stueve died as a result of the burns suffered in the collision. Plaintiff alleges that a cause of the fire was a

defectively-designed gasoline tank and tank lid on the motorcycle which permitted the escape of fuel upon collision.

However, it appears that the cause of the collision itself was the negligence of one Joseph Witherspoon, the driver of the car which collided with the motorcycle. On April 22, 1976, a wrongful death action was brought by plaintiff in state court against Witherspoon. An answer was filed the same day and a hearing held, a transcript of which has been made available to the Court. It reflects that a settlement had been reached with respect to both the wrongful death claim and a survivorship claim (which had not been filed at that time, apparently due to a delay in the appointment of plaintiff as administratrix of the estate). Witherspoon was to pay $40,000 on the wrongful death claim and $10,000 in satisfaction of the potential survivorship claim, or in the aggregate $50,000, this being the limit of his insurance coverage. Plaintiff stated she understood that Witherspoon was a minor with no known assets, and thus was in essence judgment-proof beyond the limits of policy coverage. On May 12, 1976, the Probate Court authorized the settlement of the survivorship claim for $10,000, and in return plaintiff as administratrix executed a covenant not to sue Witherspoon on the claim. A journal entry reflecting the $40,000 wrongful death settlement and its distribution was filed May 14, 1976. Copies of all these documents appear in the file of the present case.

## A. *Motion for Summary Judgment*

[1] The settlement with Witherspoon was the basis of a "Motion to Limit Recovery" filed by defendants, in which they argued that a 1975 amendment to the Kansas wrongful death act, Chapter 303, L.1975, which removed the $50,000 limit on recovery for wrongful death, is unconstitutional. This motion was heard by Senior Judge Templar of this district, and on March 29 of this year, he held the amendment constitutional. *Stueve v. American Honda Motors Co., Inc.,* 448 F.Supp. 167 (D.Kan.1978). Thus plaintiff is not to be limited to a $10,000 claim for wrongful death (the difference between the former $50,000 limit and the $40,000 settlement), but may recover for pecuniary loss in an unlimited amount. K.S.A. § 60–1903.

However, the settlement with Witherspoon has also engendered a motion for [partial] summary judgment now before the Court. Defendants argue that plaintiff's wrongful death claim cannot be "split," and hence that the judgment taken against Witherspoon for wrongful death precludes a second such action arising from the same collision, since rights against defendants were not reserved in the entry of judgment against Witherspoon in the wrongful death action. Such rights *were* reserved in the covenant not to sue executed in connection with settlement of the survivorship claim against Witherspoon. While defendants' motion raises a sufficiently complex question on this issue alone, the matter is complicated by the fact plaintiff's present counsel has secured an amended journal entry from the state court which purports to set aside the May 14 journal entry in its entirety and specifically reserves rights against defendants. Defendants also attack this attempted "cure" as void because it can have no retroactive effect under K.S.A. § 60–260, the Kansas equivalent of Rule 60, Federal Rules of Civil Procedure.

We first consider the question of bar or merger. Defendants rely upon the rule of Restatement, Judgments § 95 that the discharge of a judgment against one of several joint tortfeasors discharges all others who might have been liable. Plaintiff cites in opposition the Tentative Draft of this section prepared for the Second Restatement of Judgments, which states that such a discharge does not bar a later action against a "co-obligor" except in certain narrow circumstances not here relevant. Since the effect of the judgment against Witherspoon must be determined by state law, we will proceed to examine the Kansas cases cited by the parties in support of their respective positions.

Defendant cites *Parsons Mobile Products, Inc. v. Remmert,* 216 Kan. 138, 531 P.2d 435

(1975), *Anderson v. Anderson*, 155 Kan. 69, 123 P.2d 315 (1942), and *Jeffries v. Mercantile & Elevator Co.*, 103 Kan. 786, 176 P. 631 (1918), for the proposition that a judgment taken in an action precludes later relitigation of the claim. However, all three cases involved a later attempt at relitigation of a claim against the same defendant against whom plaintiff had taken judgment in the original action, and hence are inapposite here. Were plaintiff to attempt to relitigate her claim against Witherspoon, we have no doubt she would be precluded by the doctrine of merger and *res judicata*.

More appropriate is defendants' citation of *Jacobson v. Parrill*, 186 Kan. 467, 351 P.2d 194 (1960), *Rasnic v. City of Wichita*, 126 Kan. 98, 267 P. 21 (1928), and *Skaer v. Davidson*, 123 Kan. 420, 256 P. 155 (1927). These are cases in which a defendant was sued upon a cause of action which had been the subject of a prior suit against another tortfeasor, and the second suit was held barred by the first. However, we agree with plaintiff that *Jacobson* and *Rasnic* must be distinguished from the case at bar. In those cases it was held that a settlement with one party precludes a later action against another who is merely liable under the theory of *respondeat superior*. In such a case only a single wrongful act is alleged, and there would be circuity of action were suit allowed against the master or principal, for he would have a right of indemnity against the settling defendant who had already been released. *Jacobson, supra*, 186 Kan. at 473, 351 P.2d 194. The same result must obtain in a suretyship situation, or where the settling party has agreed to hold harmless the party sued in the second action. *Rasnic, supra*, 126 Kan. at 101, 267 P. 21. *See also, Sade v. Hemstrom*, 205 Kan. 514, 471 P.2d 340 (1970), and Restatement of Judgments, §§ 96–99. No such special relationship obtains between Witherspoon and the present defendants.

Defendants' position is more closely analogous to the *Skaer* case. In *Skaer*, plaintiff sued two of several tortfeasors, alleging in essence a business conspiracy, and settled and released them without reserving any rights against the others. In a subsequent suit against the remaining tortfeasors, the court held that the unconditional release of the original parties and satisfaction of the judgment entered pursuant to the release barred the subsequent suit. We note that the court was principally concerned with the effect and operation of the release; we have found no Kansas case which directly supports defendants' proposition that Kansas follows the common-law doctrine of merger to the extent that a judgment for the plaintiff against one party prevents relitigation of the same claim against another party, no matter what the nature of the wrong attributable to the other party. See 46 Am.Jur.2d *Judgments* § 389. Indeed, the rule is clearly the opposite when the tortfeasors have committed independent acts for which either could be independently liable. *Froelich v. Werbin*, 212 Kan. 119, 509 P.2d 1118 (1973).

However, "release" cases such as *Skaer* are appropriate subjects of focus in this case, notwithstanding defendants' insistence that we view the action against Witherspoon merely as a satisfied judgment. It is evident that the journal entry of May 14 is the (attorney-drafted) product of a negotiated settlement, formalized principally because of the necessity for supervised distribution to minor heirs of the deceased. It reads, in pertinent part, that plaintiff should recover from defendant

> the sum of $40,000 and costs for full, complete and final payment of any claim, demand, or cause of action which plaintiff has against defendant for the wrongful death of F. Duane Stueve . . .

No mention of other possible wrongdoers is made in the document, and hence no reservation of rights made. However, at the hearing to confirm the settlement, it became apparent that a reservation was to be made with respect to the City of Topeka if settlement for the pre-death (survivorship) claim against Witherspoon was approved by the probate court. No mention of the present defendants, or indeed of anyone else contingently liable on the wrongful death claim, was made at the hearing.

The original common-law rule with respect to settlements with less than all possible responsible parties was that the release of one joint tortfeasor releases all, even if rights against the other parties are expressly reserved. Various devices were developed by courts to avoid the effects of this harsh rule, See *Anno.* 73 A.L.R.2d 403, at 407–08. Chief among these are the exceptions which we will examine in the present case: the distinction between a "release" and a "covenant not to sue," and the distinction between "joint" and "independent and concurring" or "successive" tortfeasors.

■ The distinction between a release and a covenant not to sue refers to the effect of a settlement contract between two litigants. It is generally said that a "release" is a discharge of all wrongdoers, while a "covenant not to sue" operates only to discharge a non-settling wrongdoer to the extent of recovery against the covenantee. It is a "discharge *pro tanto.*" *Symons v. Mueller Co.*, 526 F.2d 13 (10th Cir. 1975) (citing Kansas cases). However, no necessary form for either is prescribed; the effect of (and hence the appellation given) a settlement contract must result from scrutiny of the intent of the parties to the instrument. *Lupton v. Torbey*, 548 F.2d 316 (10th Cir. 1977); *Cullen v. Atchison, Topeka & Santa Fe Ry. Co.*, 211 Kan. 368, 507 P.2d 353 (1973); *Sade v. Hemstrom, supra.* It must be admitted that the May 14 journal entry in this case demonstrates no intent to release other possible wrongdoers. On the other hand, it indicates no intent to reserve rights against the present defendants, and the transcript demonstrates that, at the time the agreement was presented to the state court, neither plaintiff nor her former counsel envisioned the possibility of a suit against these defendants.

Thus the real question for decision is whether, in the absence of any indication of intent as regards a subsequently-sued tortfeasor, we should regard a settlement contract as preclusive of the subsequent suit. This is in essence a question of the proper presumption to be applied: should the absence of an express reservation of rights lead to the presumption that a general discharge was intended, as in the Uniform Joint Obligations Act adopted in some states, or should it be presumed in the absence of express language to the contrary that a release of one wrongdoer is not intended to release others, as in the Uniform Contribution Among Tortfeasors Act which mandates merely a *pro tanto* discharge? In other words, in the absence of an express indication of the parties' intent in executing a settlement instrument, should it be construed as a general release or as a "covenant not to sue?" The latter view clearly represents the modern trend, and is incorporated in the Tentative Draft of the Second Restatement of Torts set out by plaintiff in her brief. However, in the absence of a legislative command, Kansas law on this subject must be gleaned from the case law. This may occasion some difficulty, since courts rarely view the "release vs. covenant" issue as one of presumption:

> Attention is called to the fact that some of the cases applying the intention rule seem to proceed on the theory that the release of one joint tortfeasor releases all, and other cases on the theory that the release of one joint tortfeasor does not release all, unless a contrary intention is shown. However, none of the cases has ruled on this point as a separate and distinct question.

*Anno.* 73 A.L.R.2d 403, at 408.

In *Skaer, supra*, the lack of a reservation of rights was fatal to the claim, even though no intent to release the other wrongdoers was evident. In *Coats v. Fletcher*, 79 Kan. 856, 98 P. 787 (1908) and *Edens v. Fletcher*, 79 Kan. 139, 98 P. 784 (1908), an express reservation of rights against other wrongdoers was apparently necessary to the preservation of claims against them. As recently as 1970 the Kansas Supreme Court hinted that the failure to reserve any rights against other parties would lead to the conclusion that a general release of all wrongdoers was intended, at least where other factors (such as the substantiality of the settlement) did not indicate otherwise. *Sade, supra*, 205 Kan. at

523, 471 P.2d 340, *citing City of Topeka v. Brooks*, 99 Kan. 643, 164 P. 285 (1917).

■ However, in *Jukes v. North American Van Lines, Inc.*, 181 Kan. 12, 309 P.2d 692 (1957), the Kansas court stated that "in order for a release of one to bar actions against others, a release or covenant not to sue must be a general one, which clearly shows the intention to release all parties." *Id.*, 181 Kan. at 20, 309 P.2d at 699. This rule was restated in *Milwaukee Insurance Co. v. Gas Service Co.*, 185 Kan. 604, 347 P.2d 394 (1959). Finally, in *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212 Kan. 35, 510 P.2d 145 (1973), the Kansas court ruled that when a release is given which neither expressly releases nor expressly reserves rights against third parties, the burden is upon the third parties to demonstrate that their release was intended. *Id.*, 212 Kan. at 41–42, 510 P.2d 145. Thus we believe that in the absence of any evidence produced by either party on the question of intent, and when the document is silent upon the matter, the Kansas rule is that other parties are "presumed" not released.

What little evidence of intent does exist in this case supports plaintiff's position. The monetary amount of the "friendly judgment" against Witherspoon, while certainly not inconsequential, was determined by the limits of his liability policy. Defendants' arguments about the constitutionality of the 1975 amendment to K.S.A. § 60–1903 notwithstanding, there is no evidence before the Court which would indicate plaintiff thought her wrongful death claim worth no more than the amount recovered against Witherspoon. The evident reason for not proceeding against the present defendants, or reserving rights against them, may have been that an action against defendants must be predicated upon a tort theory not yet formally recognized in Kansas, as will be discussed below.

Therefore, we believe that, based upon the evidence before us, no release of defendants was intended and hence their motion for partial summary judgment should be overruled. Yet while such a ruling will obviate the need to examine the effect and validity of the second, "amended" journal entry under K.S.A. § 60–260, we will proceed to examine plaintiff's alternate argument in opposition to the summary judgment motion, for doing so will lead us to a discussion of principles bearing upon other motions pending in this case.

Plaintiff has argued that the general rule prohibiting subsequent suits against wrongdoers jointly liable does not apply when a single wrongful act does not form the basis of the joint liability. In such cases as *Jacobson v. Parrill, supra*, and *Sade, supra*, the Court focused upon the fact that in a master-servant or principal-agent situation, there is no "independent wrongful act" attributable to the party sought to be held liable under the theory of *respondeat superior*.

Plaintiff's "independent act" theory is supported by the case of *Milwaukee Ins. Co. v. Gas Service Co., supra*. In that case a construction company broke a gas line, and thereafter notified the gas company that a dangerous situation had been created. Some time later, the leaking gas caused an explosion in plaintiff's house. The plaintiff settled with the construction company and executed a covenant not to sue which did not reserve rights against any other party. Thereafter, plaintiff sued the gas company for its negligence in failing to correct the gas line rupture after being notified of it. The court held the construction company and the gas company were not "joint tortfeasors" in the sense that a release of one would release the other, since the negligence of each was predicated upon independent acts:

Under the facts in the instant case, it is apparent that Ritchie Brothers and defendant were not joint tort-feasors. Assuming Ritchie Brothers was negligent in breaking the gas line and assuming the defendant gas company was guilty of negligence in failing to take corrective measures after being advised gas was escaping from its lines, the act of each was an independent and concurrent or successive act. Between Ritchie Brothers

and the defendant gas company there was no concert of action, common design, joint enterprise or other relationship which would make them joint tort-feasors. In no event could the two have acted together or jointly. Where the independent tortious acts of two persons combine to produce an injury indivisible in its nature, either tort-feasor may be held for the entire damage—not because he is responsible for the act of the other, but because his own act is regarded in law as a cause of the injury. In cases of such independent concurring or successive torts, the release of one wrongdoer does not release the other.

*Id.*, 185 Kan. at 609, 347 P.2d at 399. Similar in import is the case of *Jukes v. North American Van Lines, Inc., supra,* wherein the court held the release of defendant's subcontractor/agent did not release defendant from liability for its independent acts occurring prior to entrustment of the damaged property to the settling party.

However, in *Cullen v. Atchison, Topeka & Santa Fe Ry. Co., supra,* the Kansas court appeared to retreat from this distinction between joint liability and joint action for purposes of determining the effect of a release. Plaintiff's decedent was a passenger in an automobile struck by defendant's train. A settlement was reached with the insuror of the automobile driver, and plaintiff thereafter sued the railroad. Following the *Milwaukee* case, *supra,* the trial court had declined to dismiss the action against the railroad. The Kansas Supreme Court reversed, saying:

> The trial court in paragraph 1 of its memorandum opinion stated there was no concert of action, common design or other relationship which could make [the railroad and the automobile driver] joint tortfeasors and that the allegations in [plaintiff's complaint against the railroad] charge it with being an independent concurring or successive tortfeasor. Under our decisions the trial court erred in its conclusion. Neither concerted action nor common design is essential to a determination that two or more wrongdoers are joint tortfeasors.

*Id.*, 211 Kan. at 374–75, 507 P.2d at 360. The court cited *Tilden v. Ash*, 145 Kan. 909, 67 P.2d 614 (1937) for the proposition that substantially concurrent negligent acts will render each wrongdoer liable for the entire damage as "joint tortfeasors." Defendants in the present case cite *Reed v. Mai*, 171 Kan. 169, 231 P.2d 227 (1951) for essentially the same proposition.

■ As plaintiff notes, in *Fieser, supra,* the Kansas court relaxed the rules concerning joint liability and the effect of a release in a "successive tort" situation. *Fieser* was a case in which a malpracticing physician's acts aggravated the original injuries, and the court held an action against the physician not barred by a release of the most all-encompassing sort given the original wrongdoer. It may be that the present case presents a mere variation of the "successive tort" idea, for the culpable *acts* of the present defendant occurred, if at all, in the course of planning and design of the motorcycle, even though the injuries caused thereby were entirely concurrent with those attributable to the negligence of Witherspoon. We need not face this question, however, in ruling upon the motion to dismiss. Rather, we observe that insofar as no distinction is made in cases such as *Cullen* between joint action and joint liability, and thus rules of joint liability determine the effect of a release, there may be no reason to question the nature of the act alleged in multiple-tortfeasor negligence cases which arose after July 1, 1974. The Kansas Supreme Court has held that common-law principles of joint liability do not survive the enactment of the Kansas comparative negligence statute, K.S.A. § 60–258a. *Brown v. Keill*, 224 Kan. 195, 580 P.2d 867 (1978):

> [W]e hold under the provisions of K.S.A. 60–258a the concept of joint and several liability between joint tort-feasors previously existing in this state no longer applies in comparative negligence actions.

*Id.*, 224 Kan. at 204, 580 P.2d at 874. It follows that since a given defendant in a case governed by K.S.A. § 60–258a can be

held liable in any event only for that percentage of injury attributable to his fault, a release of that defendant cannot inure to the benefit of potential co-defendants. Under former rules of joint liability, to release one defendant unconditionally may have been viewed as relinquishment of the right to recover one's entire damages from a party liable, and thus as extinguishing the action as to potential defendants who stand as third-party beneficiaries to the release. This cannot be the case in an action under K.S.A. § 60–258a.

■ In fact, this court is of the opinion that the comparative negligence statute as construed in *Brown, supra*, must also work changes in a court's handling of covenants not to sue. Prior to the advent of comparative negligence, a covenant not to sue discharged other potential defendants to the extent of the award or settlement paid plaintiff. *Cullen, supra* ; *Carlisle v. Woerner*, 149 Kan. 604, 89 P.2d 29 (1939). In *Nagunst v. Western Union Telegraph Co.*, 76 F.R.D. 631 (D.Kan.1977), we discussed the application of this "dollar-for-dollar credit" principle to actions under K.S.A. § 60–258a:

> We believe this principle must be carried over into the comparative negligence arena to preclude double or multiple recovery by a plaintiff. However, to adhere to the former procedure of applying the "credit" in a specific dollar amount against the judgment already taken against the named defendant(s) would be to perpetuate the principles of joint liability, and allow a plaintiff to do indirectly what he could not do directly.
>
> . . .
>
> We believe a result more consistent with the intent of the Kansas Legislature can be attained by ascertaining the percentage of negligence attributable to the covenantee, and reducing the recovery against the named defendant(s) by that percentage. . . . If a plaintiff voluntarily chooses not to sue such a person, as by execution of a covenant not to sue, he simply loses his right to recover against that person the percentage of the total award which corresponds to the percentage of negligence attributable to the party not sued. *See Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963).

*Id.*, 76 F.R.D. at 634–35.

■ Applying the reasoning above to the present case, it appears that defendant's motion for summary judgment should be overruled and denied, and that defendant should receive a *pro rata* credit against any award calculated with reference to the percentage of fault attributable to Witherspoon. However, discussion of comparative negligence principles and their effect on the present action points up the central issue of the case. It is unsettled in Kansas whether there can be a comparison of liability between a negligent tortfeasor and a manufacturer sued upon the theory of strict products liability.

### B. *The Motion to Join*

■ The question of the interplay of strict liability and comparative negligence concepts is raised by defendant in its "Alternative motion for joinder . . . or for dismissal . . . or that the negligence of Witherspoon be taken into consideration." The aspect of the motion which requests dismissal is founded upon the claim Witherspoon is an "indispensible" party, Rule 19, Federal Rules of Civil Procedure, who must be joined in this action. Defendant then requests dismissal of the action for the reason Witherspoon's joinder would divest the court of diversity jurisdiction. It should be plain from the discussion of several liability above that Witherspoon's presence in the action is not necessary for maintenance of plaintiff's claim. We reject plaintiff's Rule 19 argument for the reasons stated in a similar context in *Greenwood v. McDonough Power Equipment, Inc.*, 437 F.Supp. 707, 709–711 (D.Kan.1977). Alternatively, defendant requests that Witherspoon be joined as a "nominal party" for the sole purpose of comparing his negligence with that of defendant, without dismissal if the Court finds Witherspoon's negligence to be "ancillary." We also deny this request, which would cause more jurisdic-

tional and procedural problems than it would solve. While K.S.A. § 60–258a(c) does provide a joinder mechanism whereby a defendant may bring in a co-defendant regardless of the possibility of liability *inter sese*, federal courts of this district have viewed this provision as merely a procedural device inapplicable in federal courts. Joinder in such a situation is not authorized by the Federal Rules of Civil Procedure. *Beach v. M. & N. Modern Hydraulic Press Co.*, 428 F.Supp. 956 (D.Kan., 1978); *Boyd v. Clegg*, No. 78–4100 (D.Kan., 6/16/78); *Robson v. LaPlant*, No. 76–174–C5 (D.Kan., 3/27/78, unpublished). This Court has consistently adhered to the "phantom party" concept suggested in PATTERN INSTRUCTIONS FOR KANSAS 2d § 20.05 (1977) and 3 VERNON'S KANSAS STATUTES ANNOTATED § 60–258, p. 88 (1977 Concannon Supp.). *See Greenwood, supra*; *Nagunst, supra*; and *Carroll v. Chrysler Corp.*, No. 77–4017 (D.Kan., 7/13/78, unpublished). The joinder mechanism of K.S.A. § 60–258a(c) is unique to Kansas, and in any event, the Kansas Supreme Court has stated in *Brown* the apportionment of liability mandated by the statute is to be undertaken regardless of whether the prospective co-defendant is or can be formally joined. Thus we will deny all aspects of defendant's motion which seek formal joinder or dismissal.

The third alternative request in defendant's motion, however, is for application of the "phantom party" procedure to apportion negligence between Witherspoon and defendant, and allot the jury's verdict accordingly. This comports with our prior practice in the cases cited above. Plaintiff, however, strongly objects to any attempt to apply comparative negligence principles to a case founded upon the theory of strict products liability. Defendant argues that there is a "common denominator" between the concepts of negligence and strict liability in that both require a showing of fault if a defendant is to be held liable. Plaintiff, understandably, argues the difference between the concepts, points to the specific reference to "negligence" in the statute, and bases a collateral argument upon the treatment of the assumption of risk defense in recent Kansas cases.

The interrelationship of comparative negligence concepts and strict products liability now faces or has faced the courts of many states. This meeting of "fault and no-fault concepts," Levine, *Strict Products Liability and Comparative Negligence*, 14 SAN DIEGO L.REV. 337 (1977) is inevitable, for the majority of the states have adopted both some form of comparative liability scheme and the doctrine of tort recovery set forth in Restatement, Torts 2d, § 402A. The majority of courts whose written opinions have dealt with the issue have concluded that their comparative negligence systems, occasionally with some modification, should be applicable to actions brought in strict liability. Plaintiff in the instant action argues that many of these opinions have issued from federal courts whose opinions of state law are not the most persuasive precedent. In the absence of a "certified question" procedure, however, see *West v. Caterpillar Tractor Co., Inc.*, 336 So.2d 80 (Fla.1976), it is often the case that the federal courts are the first to issue written opinions upon novel questions of law. Both strict liability and comparative negligence are relatively new to Kansas jurisprudence, and "we stand now at the point of confluence of these two conceptual streams." *Daly v. General Motors Corp.*, 20 Cal.2d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978). For the reasons to be stated below, we believe the Kansas courts in the appropriate case would apply comparative negligence principles to a products liability action such as that before us, and therefore will grant that portion of defendant's motion which requests such application.

It is in a sense ironic that courts and counsel have had such difficulties resolving the perceived clash between comparative negligence and strict liability. Both concepts have grown out of a general dissatisfaction with traditional rules of negligence and tort recovery. Feinberg, *The Applicability of a Comparative Negligence Defense in a Strict Products Liability Suit*, 42 INS. COUNSEL J. 39 (1975). Traditional tort

(and warranty) theories proved conceptually unable to protect the injured consumer of manufactured goods, so strict liability principles were fashioned to make manufacturers more responsible for injuries caused by defective products. Concurrently, dissatisfaction with traditional rules of contributory negligence and their harsh barring effect upon a plaintiff not greatly at fault led many states to adopt comparative negligence systems. Both innovations have had the effect of "evening the odds" for an injured individual faced with the prospect of grappling with complex judicial machinery and powerful commercial defendants. He need not negate his own wrongdoing as an element of his action. *Brooks v. Dietz,* 218 Kan. 698, 705, 545 P.2d 1104 (1976). Nor need he, in a strict liability action, prove a particular act of negligence attributable to the defendant, in keeping with the public policy of enterprise liability which underlies the § 402A concept. Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS.L.J. 825, 826 (1973). However, the question now presented is whether the plaintiff is entitled to an award undiminished by the percentage of causal fault attributable to himself or others he has chosen not to sue. In *Brown v. Keill, supra,* the Kansas court found "no social policy that should compel defendants to pay more than their fair share of the loss." *Id.,* 224 Kan. at 203, 580 P.2d at 874. Whether the "enterprise liability" of manufacturers embodied in § 402A is an exception to this statement is the question that now confronts us.

At the outset, we wish to note the procedural problems attendant upon the application of one rule of recovery for actions brought in strict liability, and another for actions in negligence or warranty. These three theories of recovery overlap and are frequently pleaded in the alternative in products liability actions. There is particularly little difference in a design-defect case such as this one between a negligence action and an action for strict liability. See Wade, *Strict Tort Liability, supra,* 44 MISS. L.J. at 841; Wade, *A Conspectus of Manufacturer's Liability for Products,* 10 IND.L.

REV. 755, 767 (1977). The "anomaly" that would result from the nonapplication of comparative negligence principles to strict liability, *Butaud v. Suburban Marine & Sporting Goods, Inc.,* Alaska, 555 P.2d 42 (1976) thus becomes particularly evident when a products liability complaint is alternatively pleaded.

Plaintiff argues that the Kansas comparative negligence statute by its terms applies only to negligence. While this is true, it is not particularly persuasive. The Kansas Supreme Court in *Brown, supra,* recognized that the statute is not a model of careful draftsmanship. 224 Kan. at 199–200, 580 P.2d at 867. And, to some extent, plaintiff must rely upon a negative argument, contending that the enactment of a comparative scheme applicable to negligence was designed to preclude judicial adoption of such a scheme in strict liability actions. While at least one court has followed this reasoning, see *Kirkland v. General Motors Corp.,* 521 P.2d 1353 (Okl.1974), it is just as reasonable to assume the passage of a comparative negligence statute was not designed to preclude a comparison of fault in strict liability actions, Wade, *Products Liability and Plaintiff's Fault,* 29 MERCER L.REV. 373, 380 (1978); and to extrapolate that if the principle is helpful and fair, "it should be applied by [a] court as a principle of common law." Schwartz, *Strict Liability and Comparative Negligence, supra,* 42 TENN.L.REV. 171, 179 (1974).

It is true some legislatures have made their will more clear by passing comparative-fault statutes which by their terms include more than mere negligence. *Daly, supra,* 144 Cal.Rptr. 380, 575 P.2d at 1170. Yet typically a state's adoption of strict liability (and consequent ruling that mere contributory negligence is no defense thereto) predates the adoption of comparative negligence. Schwartz, *Contributory and Comparative Negligence: A Reappraisal,* 87 YALE L.J. 697 (1978). This has not been the case in Kansas, for the Kansas Legislature passed K.S.A. § 60–258a two years before the Kansas Supreme Court's endorsement of § 402A in *Brooks v. Dietz,*

*supra.* This rather unusual chronology was paralleled in *Hagenbuch v. Snap-On Tools Corp.,* 339 F.Supp. 676 (D.N.H.1972), in which the court concluded the literal rules of § 402A must be altered in light of the comparative scheme employed in negligence actions in the state.

Nor do we allot great significance to the failure of the legislature to amend the statute in response to repeated suggestions and intense lobbying efforts by interested parties. Many of the proposed bills contained provisions which altered much more than the applicability of the particular comparative system employed in Kansas. It may have been felt that the courts are the more proper vehicle for "fine-tuning" comparative procedures, now that the legislative decision to abrogate common-law tort principles is evident:

> The legislative will is clear. The implementation mechanism for the reduction of plaintiff's verdict is well established. If ever a court had a right to extend by analogy without waiting for further legislation on the subject, this would appear the appropriate occasion.

Twerski, *From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts,* 60 MARQUETTE L.REV. 297, 331 (1977).

Nor are we particularly convinced the differences between strict liability and comparative negligence so outweigh their similarities that no synthesis is possible. While there may be theoretical points of dissonance between the concepts, they may be meshed without undue practical difficulties. Plaintiff makes much of the distinctions which have arisen between assumption of risk and contributory negligence, the latter of which is traditionally not a defense to a strict liability claim. However, it must be admitted that assumption of risk *is* a "negligence" concept, and the same must be said of the "product misuse" defense applicable in strict liability actions. *Hagenbuch, supra,* 339 F.Supp. at 681; Feinberg, *supra,* 42 INS. COUNSEL J. at 52. The distinction between contributory negligence and assumption of risk in a given case may be quite slight, turning upon fine questions of knowledge and voluntariness. If a comparative-fault system is routinely applied to strict liability actions where the plaintiff is accused of some misconduct, "there may be no need to draw such shadowy lines" which can mean the difference between a complete recovery and none at all. Schwartz, *Strict Liability, supra,* 42 TENN.L.REV. at 175. *See also Netzel v. State Sand & Gravel Co.,* 51 Wis.2d 1, 186 N.W.2d 258 (1971).

Similarly, a defendant's liability in a products case turns upon questions of culpability closely akin to traditional negligence concepts. A plaintiff is not required to prove a manufacturer negligent in the classic sense, but must prove the existence of a defect and unreasonable danger resulting therefrom. Duty is presumed, and plaintiff need not demonstrate a specific act of negligence in the manufacturing process, but a product which is not unsafe or defective gives rise to no liability. Comment (h) to § 402A, which speaks of "defectiveness" in terms of safety for *normal* handling and consumption, interjects negligence concepts of foreseeability and proximate cause into strict liability. *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276 (5th Cir. 1975); *see also Horn v. General Motors Corp.,* 17 Cal.3d 359, 131 Cal.Rptr. 78, 551 P.2d 398, 406 (1976). These similarities attenuate the practical difficulties of reaching an accord between § 402A and comparative concepts.

On the other hand, the practical difficulties which would arise from the preservation of separate applicability of the concepts are formidable. If we accept the proposition that some measure of fairness should be accorded among co-defendants, what policy commands that "the specifically negligent (and therefore more plainly culpable) tortfeasor may yet assert the victim's fault while his strictly-liable . . . companions may not."? *West v. Caterpillar Tractor, Co., Inc.,* 547 F.2d 885 (5th Cir. 1977). If the reply to this question is that the policy in favor of imposing enterprise liability necessarily leads to this result when one defendant is the manufacturer of

a product, in the interest of deterring manufacture of unsafe products, one further observation must be made. If assumption of risk is to remain a complete bar to strict liability, the "deterrent effect" argument leads to the curious situation that "it profits the manufacturer to make his product so defective that in the event of injury he can argue that the user had to be aware of its patent defects." *Daly, supra,* 144 Cal.Rptr. at 387, 575 P.2d at 1169. A system which makes it potentially more advantageous to be brazenly reckless than not negligent at all is certainly an anomaly.

▪ The barring effect of traditional strict liability defenses deserves more extended comment. Strict liability was developed to free injured consumers from the constraints imposed by traditional negligence and warranty theories. *Daly, supra,* 144 Cal.Rptr. 380, 575 P.2d at 1169. However, after the introduction of comparative negligence systems, the strict liability action may be less advantageous to the injured consumer who contributed to his injury than an action in negligence. The *Kirkland* case *supra,* cited by plaintiff in support of her contention that comparative liability should not be considered in this action, illustrates the harsh effects upon plaintiffs of such a view, for in that case plaintiff was held absolutely barred by her misuse of the product. *See also Oltz v. Toyota Motor Sales, U.S.A., Inc.,* 166 Mont. 217, 531 P.2d 1341 (1975). The sole jurisdiction whose comparative liability statute is specifically made inapplicable to strict liability actions has also demonstrated the harshness of the "all-or-nothing" rule when plaintiff is himself negligent. *Hoelter v. Mohawk Service, Inc.,* 170 Conn. 495, 365 A.2d 1064 (1976). The appropriate remedy for such harsh results would be to reduce, and not negate, plaintiff's award, which necessitates complementary treatment of the extent of a defendant's liability.

▪ Plaintiff has argued that a manufacturer who has observed the standard of his industry (and thus presumably is not "negligent") may be held liable in strict liability. Yet this is a difference of degree and not of kind. Negligence itself is not tied to a subjective standard. If the "ordinary, reasonable, and prudent" test imposes a higher standard upon the defendant than he is capable of, he may yet be liable:

> That kind of fault known as negligence [does] not require moral blameworthiness or ethical culpability; it might include them, but it [goes] beyond to comprehend legal fault.

Wade, *Products Liability and Plaintiff's Fault, supra,* 29 MERCER L.REV. at 376. Imposition of strict liability for placing a bad product on the market is similarly "legal" fault. *Id.* at 377. While a strictly-liable manufacturer may be subject to a different standard of liability than a negligent individual, it is not by the imposition of a "higher duty" but by an easier method of recovery. In this sense, § 402A is a procedural innovation in response to a felt need to encourage safe product design and manufacture. It must be emphasized that the liability of a manufacturer is not absolute; he is not an insurer or guarantor of the consumer's safety, and strict liability is not a "no-fault" doctrine. *Daly, supra,* 144 Cal. Rptr. 308, 575 P.2d at 1166; *Butaud, supra,* 555 P.2d at 43; Note, *Applying Comparative Negligence to Strict Products Liability,* 4 WESTERN STATE L.REV. 283 (1977). For there to be liability, the standards of § 402A must be violated, and under the traditional tort analysis, the plaintiff's conduct must not amount to a break in the chain of causation. As long as the consumer's own conduct which caused or contributed to the injury is considered in determining the manufacturer's liability, it cannot be said that strict liability reflects a social policy that society should bear the entire cost of each products-related injury.

▪ The rules of liability encompassed in § 402A were developed to aid the consumer "powerless" to protect himself when faced with the prospect of proving a manufacturer's negligence. *Greenman v. Yuba Power Prods. Co.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901 (1963). The burden of proof shouldered by a plaintiff will not be significantly altered by the imposition of

a comparative liability system in all products cases. Thus the battle must be fought upon the field of "enterprise liability" so often used to support § 402A. We must remember that the "business" or "society" which bears the cost of a plaintiff's strict liability recovery refers in reality to other users of the manufacturer's product since the cost is inevitably passed on. Why is it desirable to transfer to these third parties the cost of that part of a plaintiff's injury which is attributable to his own culpable conduct? If comparative liability is adopted in strict liability actions, the manufacturer will not be absolved of liability; the motivation to make a safe product will not disappear. It is true the manufacturer's exposure to liability will be lessened to the extent the victim's conduct contributed to the injury, *Daly, supra,* 144 Cal.Rptr. 380, 575 P.2d at 1169, but it is also true the manufacturer's exposure may be increased when a normally-barred plaintiff is allowed some recovery as a consequence of the defendant's manufacture of a dangerous product.

The traditional wisdom that contributory negligence is no defense to a strict liability action accords with the modern dislike of the defense as a complete bar to an injured plaintiff's claim. The parallel development of comparative negligence reflects the same concern. We do not believe it can be questioned the comparative liability approach is a more sensible solution to the concern with barring an otherwise legitimate claim. Adoption of such a solution, however, cannot be a one-way street. The same equitable considerations which underlie comparative liability and militate against barring a culpable plaintiff must also work in favor of a defendant who does not bear all the blame for the injury:

"Such "all-or-nothing" defenses are inequitable in their operation because they fail to distribute responsibility in proportion to fault and place upon one party the entire burden of a loss for which two are, by hypothesis, responsible. If, for example, the user's conduct in failing to discover or guard against the product's defect is highly irresponsible and the product's defect slight, it offends our sense of justice and fair play to impose the whole loss on the manufacturer in the name of imposing the burden of defective products on manufacturers as one of the costs of doing business. There is no reason why other consumers and society in general should bear that portion of the burden attributable to the plaintiff's own blameworthy conduct.

*Pan-Alaska Fisheries, Inc., v. Maine Const. & Design Co., Inc.,* 565 F.2d 1129, 1139–40 (9th Cir. 1977).

When Comment (n) to § 402A, dealing with assumption of risk and non-operation of contributory negligence as a bar in § 402A actions, was formulated it does not affirmatively appear the Restatement reporter envisioned "the possibility of limiting rather than precluding liability" when the plaintiff himself was culpable. Note, 17 DE PAUL L.REV. 614 (1968). Contributory negligence and assumption of risk are common-law approaches which operate on the premise everything is "black and white." The advent of comparative liability systems has demonstrated happily that this need not be the case.

Plaintiff argues that the Kansas case of *George v. Beggs,* 1 Kan.App.2d 356, 564 P.2d 593 (1977) demonstrates the unwillingness of the Kansas appellate courts to treat contributory negligence and assumption of risk as allied concepts, and inferentially indicates that strict liability and negligence actions are regarded as different in kind in Kansas. We do not so view the case. In *George* plaintiff was an employee injured in the course of his employment, and the Court of Appeals refused to abrogate the historical defense of assumption of risk in employment cases. The Court cited the case of *Borth v. Borth,* 221 Kan. 494, 561 P.2d 408 (1977) for the proposition that "the doctrine of assumption of risk is still viable in Kansas though its application is limited to cases such as this where a master-servant relationship is involved. . . ." *George, supra,* 1 Kan.App.2d at 351, 564 P.2d at 595. Both *George* and *Borth* treat "assumption of risk" in its traditional, limited sense, see

*Smith v. Blakey, Adm'r*, 213 Kan. 91, 515 P.2d 1062 (1973), and both apparently ignore the fact that "assumption of risk" had been mentioned as a defense to the new theory of recovery sanctioned the previous year in *Brooks v. Dietz, supra.*

We believe stronger indications of the course Kansas courts will follow point to the application of some comparative liability system in all products actions. Three commentators who have written articles concerning comparative negligence in Kansas have forecast the application of comparative principles to strict liability. Woods, *The New Kansas Comparative Negligence Act—An Idea Whose Time Has Come,* 14 WASHBURN L.J. 1, 25 (1975); Schwartz, *Comparative Negligence In Kansas—Legal Issues and Probable Answers,* 13 WASHBURN L.J. 397, 412 (1974); Kelly, *Comparative Negligence—Kansas,* 43 J.B.A.K. 151, 199 (Fall 1974). Each of these articles is cited with approval in *Brown v. Keill, supra,* 224 Kan. at 202, 580 P.2d at 873. Further, when § 402A was adopted as a rule of liability in *Brooks, supra,* the Court cited Comment (n) to § 402A for the proposition that contributory negligence is no defense. Yet in determining whether plaintiff's conduct barred his recovery as a matter of law, the Court relied upon cases dealing with contributory negligence. *Brooks, supra,* 218 Kan. at 708, 545 P.2d 1104. In the (court-written) Syllabus, ¶ 6, assumption of risk is characterized as "a form of contributory negligence." The three dissenters, led by Justice Miller, who felt plaintiff's conduct should have barred his recovery discussed the effect of the conduct "however [it] be categorized—contributory negligence, assumption of risk, or contributory fault." Also, to the extent the Court's use of "negligence" and "fault" as interchangeable concepts may be significant, see Note, *Products Liability, Comparative Negligence, and the Allocation of Damages among Multiple Defendants,* 50 SO.CAL.L.REV. 73, 78 (1976), we note a close reading of *Brown v. Keill, supra,* reveals the Court speaking of the "negligence *or fault*" of parties (580 P.2d at 870, 874, 876); "relative fault," "percentage of fault," and "proportionate

fault," (*Id.* at 872, 874, 875, 876); and generally of parties "at fault" (*Id.* at 870, 874–76). The court speaks in terms of "negligence" alone only when discussing the language of the comparative negligence statute itself or when reviewing prior Kansas law; at every turn in interpreting the statute and prescribing the method of its operation reference is made to "fault." The consistency of the language persuades us it was not unintentional.

Finally, two recent opinions by the Kansas Supreme Court indicate that comparative negligence may be applied to an action in which the fault of one defendant is not based upon a traditional negligence theory of liability. In *Wilson v. Probst,* Kan., 581 P.2d 380 (1978), plaintiff brought suit against several defendants for injuries resulting from a highway accident. One of the defendants joined the Kansas Secretary of Transportation as a party defendant pursuant to K.S.A. § 60–258a(c), asserting that a defect in the highway contributed to the accident. The trial court dismissed the Secretary on the ground highway defect liability is not based on negligence and cannot be compared with the liability of negligent defendants pursuant to the Kansas comparative negligence statute. On interlocutory appeal, the ruling was reversed and the Secretary reinstated as a party.

The trial court had based its ruling on the proposition the statute imposing liability on the state for highway defects, K.S.A. § 68–419, is strictly a rule of statutory liability and is not predicated upon the negligence of the state. This proposition is supported by a long line of prior cases interpreting the statute. The Supreme Court held the comparative negligence statute must be held to have altered this interpretation, and ordered the liabilities compared on the basis of proportionate fault.

In *Thomas v. Board of Township Trustees,* Kan., 582 P.2d 271 (1978), plaintiff brought suit against, *inter alia,* a township for injuries arising from an automobile accident. K.S.A. § 68–301, a counterpart to K.S.A. § 68–419, by its terms imposes liabil-

ity on townships for road defects, but only when a plaintiff is not contributorily negligent. Plaintiff recovered a verdict, and on appeal, the township questioned whether plaintiff's admitted contributory negligence should not bar his action and whether K.S.A. § 60–258a should apply to road defect cases.

The Court first noted that both K.S.A. § 68–301 and K.S.A. § 68–419 "have long been interpreted as based upon the theory of strict statutory liability rather than upon a theory of common-law negligence." *Id.* at 276. The Court cited *Arnold v. Coffey County Comm'rs.*, 131 Kan. 343, 291 P. 762 (1930) to demonstrate that traditionally the focus has been upon the existence of a defect rather than proof of negligence:

> . . . [I]n an action of this character, the simple question is: Was the bridge, culvert or highway defective? The question of how much or how little care had been exercised by the responsible county officials in the construction or maintenance of the bridge, culvert or highway in question is of but little or no consequence. If the result of their efforts is a defective bridge, culvert or highway, such defect makes the county liable if the other elements of liability are present . . ."

*Id.*, 131 Kan. at 346, 291 P. at 764.

The Court in *Thomas* proceeded to explain that governmental liability for highway defects is "a concept based upon negligence *per se*" which focuses upon the results accomplished rather than the diligence exercised, citing with approval two Wisconsin cases dealing with highway defects and one case dealing with statutory "dog-bite" liability. In all the Wisconsin Supreme Court had applied comparative negligence principles; we note also that Wisconsin treats strict products liability as a form of negligence *per se* for comparative liability purposes. *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967). The Court concluded that the culpability of the township in *Thomas* was comparable to the negligence of the other parties in the case, and upheld the verdict.

This evidence of the thinking of the Kansas Court, taken in conjunction with the reasoning set forth above, convinces us some form of comparative liability will be applied to strict liability actions when the question reaches appellate review in the state court system. To reach such a result a court need not "inject negligence concepts" into strict liability, *Kinard v. Coats Co., Inc.*, 553 P.2d 835 (Colo.App.1976), for those concepts are already there. The problems of reconciliation of comparative and strict liability are "more apparent than real." *Butaud, supra*, 555 P.2d at 45.

■ Having reached the conclusion that the respective fault or causal contribution of the parties should be compared in strict liability actions, we hasten to note one difficulty in the mechanical application of the Kansas comparative negligence statute to strict liability actions with a simple substitution of the concept "fault" or "cause" in place of the word "negligence" each time it appears in the statute.

The Kansas Legislature in K.S.A. § 60–258a adopted a "modified" rather than "pure" scheme of comparative negligence. K.S.A. § 60–258a(a) provides "The contributory negligence of any party in a civil action shall not bar such party . . . from recovering damages . . . *if such party's negligence was less than the causal negligence of the party or parties against whom claim for recovery is made* . . ." This "forty-nine percent" rule has the practical effect of retaining contributory negligence as a complete defense when the plaintiff is equally at fault. Schwartz, *Strict Liability, supra*, 42 TENN.L.REV. at 179. We question whether the imposition of this aspect of the statutory comparative negligence scheme is compatible with the reasons underlying the application of comparative liability to products actions.

At least two courts which have held strict liability actions susceptible to comparative-fault analysis have apparently adopted the "modified comparative" statutory scheme of their jurisdictions for this purpose. *Hagenbuch, supra*; *Murray v. Beloit Power Systems, Inc.*, 450 F.Supp. 1145 (D.V.I.

1978). In *Murray* there was express comment that a plaintiff more than 50% at fault would be barred. *Id.*, 450 F.Supp. at 1147 n. 3. However, it does not appear that in either case the court was faced with a plaintiff who would be so barred.

It may persuasively be argued that it is inconsistent with the purposes of strict liability to bar from recovery a plaintiff who is found more "at fault" than a strictly-liable defendant. In the terms of Comment (n) to § 402A, it is hardly possible to state as a matter of law that a plaintiff whose causative fault is assessed at 60% has voluntarily assumed the risk of a known danger. His conduct may be "merely" gross negligence of the most oblivious sort. If in a strict liability action a plaintiff need not negate his own wrongdoing as an element of his action, and contributory negligence is to be no defense, *Brooks, supra*, 218 Kan. at 705, 545 P.2d 1104, there may be an anomaly in preserving *any* vestige of the "barring effect" of plaintiff's conduct in an action founded upon § 402A. It is certainly conceivable that, in order to preserve a plaintiff's "right" not to be barred by simple contributory negligence, a "pure" comparative liability scheme should be employed in actions under § 402A.[1]

On the other hand, if the purpose of rejecting simple contributory negligence as a defense to strict liability is simply to eliminate the harsh effects of "barring" a plaintiff who is only minimally at fault, this purpose would be served by application of the entire statute, including the "49% rule." Considerations of procedural convenience certainly militate in favor of such a course, and concern with court intrusion upon the

---

1. If plaintiff is to relinquish the right to recover his entire damages from a § 402A defendant regardless of his own culpability or that of third parties, perhaps defendant should relinquish the right to the complete bar provided by the comparative negligence statute. It cannot be denied the result of application of such a "pure" comparative system would be the alteration of the outcome of an action when plaintiff would have been barred by his assumption of risk or, in a proceeding for negligence, by the "49% rule." This would be offset, however, by the benefit to the manufacturer of verdict reduction.

Also, application of a "pure" system would better serve the "deterrence" policy in that, regardless of the culpability of plaintiff, the manufacturer would be liable for that portion of the injury the jury finds was caused by the product defect. The result would be a more equitable apportionment of loss than is found in either the "all-or-nothing" rule which predated comparative negligence, or the "some-or-nothing" principle of modified comparative negligence. No great violence would be done to the interest of consumer protection and rationale of enterprise liability which underlies § 402A.

While a strictly liable defendant cannot, in a "pure" comparative system, interpose the plaintiff's conduct as a complete bar to an action, we do not believe such a system cannot coexist with a "modified" scheme applicable to actions for negligence. In a state where the liability of the plaintiff is compared against the liability of each defendant in turn, the possibility exists that a 40% negligent plaintiff would not be able to recover from a defendant 35% at fault who is not subject to strict liability, while recovery could be had against a 25% at fault manufacturer joined in the case. In Kansas, however, the fault of plaintiff is compared with the aggregate liability of all defendants for purposes of K.S.A. § 60–258a, 3 VERNON'S KANSAS STATUTES ANNOTATED § 60–258b (1977 Concannon Supp.) at 87, so this problem need never arise. When plaintiff is found 50% or more at fault, however, recovery against the merely negligent defendant whose liability is completely controlled by legislative enactment would be barred, and plaintiff would "lose" that percentage of the verdict attributable to that party. In any event, the manufacturer would bear no more than his share of the loss, and plaintiff's recovery against a strictly liable manufacturer would not be barred unless his contributory fault is assessed by the jury at 100%.

Whether a "pure" or "modified" scheme is applied in the "51% culpable plaintiff" situation, little practical alteration will be worked in the actual method and result of a jury's deliberations. Whatever the legal logic behind the contributory negligence/assumption of risk distinction (and we believe the distinction may be founded in great part upon theories of "intervening" causation which need not survive the advent of comparative liability), it is clear that a jury in considering the distinction considers primarily the degree of plaintiff's fault, and whether it "rises" to a certain standard which may in the past have barred his claim. The same considerations will underlie a determination of the percentages of liability a jury attributes to the parties in a given action; one more greatly "at fault" is assigned a larger percentage of causative fault.

legislative sphere makes this the easier option.

■ On balance, we believe the application of comparative liability in its "pure" form to § 402A actions most effectively harmonizes the policies underlying both manufacturer's liability and equitable loss allocation. We are not alone in this opinion; *see General Motors Corp. v. Hopkins,* 548 S.W.2d 344, 352 (Tex.1977) and Schwartz, *Strict Liability, supra,* 42 TENN. L.REV. at 181 (when statute is not expressly applicable to strict liability, court may apply "more appropriate" comparison system to judge-made theory of strict liability). At the same time, we recognize that persuasive arguments may be made for the preservation of the "49% rule" in all products actions, particularly since they are often alternatively pleaded. We will decline to predict which of these options will be chosen in Kansas (assuming, of course, that we are correct in our more basic prognostication that the Kansas courts will apply comparative liability to § 402A actions). At the hearing held in the present case, there was general agreement between counsel that the fault of plaintiff's decedent was minimal at best. It appears quite likely, therefore, that we will not be faced with the problem of the 51% culpable plaintiff in this action. Comparative negligence cases are now reaching the Kansas Supreme Court with increasing regularity; perhaps the matter will be first resolved by that more authoritative forum. Accordingly, we do not today decide whether a "pure" or "modified" comparative system should be employed in strict liability actions in this state when a plaintiff is found 51% or more at fault.

Although we have undertaken much discussion of the applicability of comparative principles to strict liability in terms of the defenses a manufacturer may interpose against a culpable plaintiff, it should be clear the same arguments counsel in favor of allowing the apportionment of damages between negligent and strictly liable co-defendants. *Safeway Stores, Inc., v. Nest-Kart,* 21 Cal.3d 322, 146 Cal.Rptr. 550, 579

P.2d 441 (1978); Note, *Products Liability, supra,* 50 SO.CAL.L.REV. at 79–80. The present case involves chiefly questions of what may be called "comparative contribution." Davis, *Comparative Negligence, Comparative Causation, and Equal Protection in the Trial and Settlement of Multiple Defendant Product Cases,* 10 IND.L.J. 831 (1977). After *Brown v. Keill, supra,* a plaintiff suing in Kansas can no longer select between arguably negligent defendants and control the allocation of loss among or between them. Although often a plaintiff would prefer to sue a manufacturer alone since the manufacturer may be more likely able to satisfy a judgment than an individual tortfeasor who may share liability, we cannot envision why manufacturers alone should be compelled to pay "more than their fair share of the loss," *Brown, supra,* 224 Kan. at 203, 580 P.2d at 874. Thus in the trial of this action we will request that the jury attribute causal fault to Witherspoon as well as the existing parties, and apportion liability accordingly. Defendants' motion is granted to that extent and consistent with the discussion of comparative principles above.

C. *Other Matters*

At the hearing on the above motions, we requested counsel for plaintiff to brief the question whether Kansas would, in the proper case, adopt the theory of "crashworthiness" or "second-collision recovery." Our concern stemmed from the fact some courts have found no right to recovery when a plaintiff is injured in part by a vehicular design defect as a result of a collision "proximately" caused by other forces. These courts have reasoned that the intended purpose of a vehicle "does not include its participation in collisions with other objects," *Evans v. General Motors Corp.,* 359 F.2d 822, 825 (7th Cir. 1966). *See also, Simpson v. Hurst Performance, Inc.,* 437 F.Supp. 445 (M.D.N.C.1977); *Shumard v. General Motors Corp.,* 270 F.Supp. 311 (S.D.Ohio 1967). Clearly the trend of the majority of jurisdictions, however, is to hold a vehicle manufacturer has a duty to design a vehicle to avoid unnecessarily aggravat-

ing injuries where the risk of an accident and the potential for enhanced injuries is sufficiently foreseeable. The Court has found thirty-six jurisdictions which have adopted this "crashworthiness" standard in one form or another; we will not cite all such cases here. Discussions of the doctrine, and citations to many such cases, may be found in Foland, *Enhanced Injury*: *Problems of Proof in "Second Collision" and "Crashworthy" Cases*, 16 WASHBURN L.J. 600 (1977); Hoenig & Goetz, *A Rational Approach to "Crashworthy" Automobiles*: *The Need for Judicial Responsibility*, 6 SW. U.L.REV. 1 (1974); Sklaw, *"Second Collision" Liability*: *The Need for Uniformity*, 4 SETON HALL L.REV. 499 (1973); and *Anno.*, 42 A.L.R.3d 560 (1972).

■ *Garst v. General Motors Corp.*, 207 Kan. 2, 484 P.2d 47 (1971) has been cited as recognizing the "crashworthiness" doctrine in Kansas. However, in *Garst* the plaintiff was not a passenger in the offending vehicle at the time of the injury. Most "second collision" cases involve riders or operators of the vehicle claimed to be defective, who suffer "enhanced injuries" in a crash as the result of the allegedly defective design. However, we are persuaded that, in view of the overwhelming weight of authority from other jurisdictions and the adoption of the "foreseeability" standard of § 402A in Kansas, the courts of this state would allow "second collision" recovery in a case such as that before us.

One of the difficulties some courts have had in adopting the "second collision" theory is that of causation. Typically, the occurrence or accident which brings about the injuries is "proximately caused" by an independent force—in this case, the negligence of plaintiff or of Witherspoon. Of course, adherence to a "but for" or *"sine qua non"* test of causation would absolve the defendant vehicle manufacturer:

> Usually the absence of a causal connection between defect and injury is urged by the manufacturer as a complete bar to the plaintiff's cause of action. The legal argument is that between the design defect and the final injury comes an entire-

ly independent and unrelated cause—the collision—which is the proximate cause of the injury and, the design defect being at most a remote cause, is not actionable. Those courts adopting the second collision-crashworthy theory proceed from an entirely different thesis. "Proximate cause" is defined in terms of foreseeability, thereby doing away with the "but for" rule. The questions of causation-in-fact from the defect and apportionment of the injury are then submitted to the jury. A policy argument is advanced in support of this approach: to avoid the "unjust" result of absolving the manufacturer of liability, it is necessary to ask whether the product caused the injury as opposed to asking whether it caused the accident.

Foland, *supra*, 16 WASHBURN L.J. at 612.

Such a focus upon the damage wrought, rather than the event from which it arose, comports with modern legal thinking on causation, see Prosser, LAW OF TORTS (4th ed. 1971), § 42 at 248, and meshes well with a comparative fault approach. In a comparative negligence jurisdiction, the jury is asked first to determine the entirety of plaintiff's injuries, and then to apportion responsibility among those whose acts or omissions were a substantial factor in producing the damage complained of.

■ Indeed, the claimed difficulty in comparing negligence with strict liability is rendered all the more a "red herring" when one realizes the comparison made is of *causal* fault. K.S.A. § 60–258a, and most other such statutes, speak in terms of comparing the *causal* negligence of the parties, with the realization that many actors can contribute in varying degrees to the total injury suffered by plaintiff. In any products liability case cause in fact must be established; in strict liability, the claimed defect must be a causative agent of the injury. A comparative fault scheme is particularly adaptable to the comparison of negligence and strict liability, for it is implicit in such a system that "proximate cause need not be an all-or-nothing issue:"

It is . . . no longer necessary to torture ourselves with an all or nothing rule on causation. We need no longer declare that if it is more probable than not that a party caused harm then causation is established at 100%. Juries should be allowed to consider the *likelihood at a percentage basis* that a party's activities caused harm.

Twerski, *The Many Faces of Misuse : An Inquiry into the Emerging Doctrine of Comparative Causation*, 29 MERCER L.REV. 403, 413 (1978).

In many of the cases adopting a "comparative fault" approach to strict liability, there has been a frank realization what is being compared is not fault, but cause. *Pan-Alaska Fisheries, supra*, 565 F.2d at 1139; *Daly, supra*, 144 Cal.Rptr. 380, 575 P.2d at 1168; *Butaud, supra*, 555 P.2d at 47 (Rabinowitz, J., concurring); *Sun Valley Airlines v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 602 (D.Idaho 1976). P.I.K.2d § 20.06 is also a formulation of this distinction:

> In making the apportionment of percentage of fault you should keep in mind that the percentage of fault attributable to a party is not to be measured solely by the number of particulars in which a party is found to have been at fault . . .
> You should weigh the respective contributions of the parties to the occurrence in question . . .

We are satisfied that a "comparative fault" or "comparative causation" approach will approximate the results reached in a "second collision" jurisdiction which does not compare the causal fault of the parties. In any event the vehicle manufacturer will be charged with only that percentage of causal fault attributable to the design defect complained of. Indeed, the procedural aspects of the crashworthiness doctrine appear to be at most a specialized form of comparative fault. Thus while we believe Kansas would, in the proper instance, adopt a crashworthiness standard, today's application of comparative liability to the facts of this case obviates any need to consider whether procedural adjustments are necessary to accommodate the "second collision" aspects of the case.

Defendants' motion for summary judgment is overruled and denied. The motion to join, dismiss, or compare fault is sustained so far as is consistent with the above opinion.

IT IS SO ORDERED.