No. 79,769

JACQUELIN LUTHER, individually, and as the parent and natural guardian of FLOYD M. LUTHER, JR., and ROBERT JOHN LUTHER; and KATHLEEN WOHLGEMUTH, as the Administratrix of the Estate of FLOYD LUTHER, SR., Deceased, *Appellants*, v. PAUL L. DANNER, JR., and SERVICE PRINTING, INC., *Appellees*.

(995 P.2d 865)

Opinion filed January 28, 2000.

*Alvin D. Herrington*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause, and *Dustin L. DeVaughn* and *Shari R.L. Willis* of the same firm, were with him on the briefs for appellants.

*Joel W. Riggs*, of McMaster & McMaster, of Wichita, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Floyd Luther, Sr., was killed when his motorcycle collided with a truck driven by Paul Danner, Jr., for Service Printing, Inc. Floyd Luther, Jr., was also on the motorcycle and was injured in the collision.

Jacquelin Luther executed a release on behalf of Floyd Jr. in settlement of her minor son's personal injury lawsuit against Danner, Service Printing, and his father's estate. On the ground that the release foreclosed any other claims against Danner and Service Printing, the district court entered summary judgment in their favor on Jacquelin's wrongful death action, her minor sons' claims,

and the estate's survival action. The Court of Appeals affirmed the district court's decision on Jacquelin's wrongful death action and reversed on the claims of the Luther children and the estate's survival action. *Luther v. Danner*, No. 79,769 (unpublished opinion filed May 7, 1999.) Jacquelin's petition for review was granted. The petition for review of Danner and Service Printing was denied.

The sole issue we must resolve on appeal is whether the general release executed by Jacquelin Luther releases her claims against Danner and Service Printing. The relevant part of the release reads as follows:

"I/We Jacquelin Luther, being of lawful age, acknowledge receipt of Six Thousand Five Hundred Dollars, ($6,500) in hand paid, receipt whereof is hereby acknowledged, do hereby and for their heirs, executors, administrators, successors and assigns release, acquit and forever discharge the estate of Floyd L. Luther, Sr., and Dairyland Insurance Company and their servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations, or partnerships of and from any and all claims, actions, causes of action, demand, rights, damages, costs, loss of service, expenses, and compensation whatsoever, which the undersigned now have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily injury and personal injuries the consequences thereof resulting or to result from the accident which occurred on the 29th day of July, 1994.

. . . .

"THE UNDERSIGNED HAVE READ THE FOREGOING RELEASE AND FULLY UNDERSTAND IT AND KNOW THAT IT IS INTENDED TO BE, AND IS, A COMPLETE BAR TO ANY FUTURE CLAIM OR ACTION OF ANY KIND ON ACCOUNT OF ANY INJURIES OR DAMAGES, WHETHER KNOWN OR UNKNOWN AT THIS TIME, CAUSED OR RESULTING FROM THE OCCURRENCE MENTIONED ABOVE.
"CAUTION: READ BEFORE SIGNING!
"/s/ (Jacqueline Luther)
"/s/ (Atty. Timothy King)
"/s/ (Kathleen Wohlgemuth as
administratrix of the estate)"

The district court's journal entry of summary judgment shows that the release was drafted by Dairyland Insurance Company, Floyd Sr.'s liability carrier. The settlement transaction it memorialized was negotiated by Floyd Jr.'s attorney and Floyd Sr.'s estate and insurer, with no participation by Danner, Service Printing, or their representative. For his part of the negotiated settlement,

Floyd Jr. dismissed his cause of action against his father's estate with prejudice. No other claims were voluntarily dismissed by Jacquelin, her sons, or the estate. Upon concluding that the release clearly and unambiguously released Danner and Service Printing from all claims by Jacquelin, her sons, or the estate, the district court granted summary judgment for Danner and Service Printing on all claims.

The Court of Appeals concluded that "so far as Jacquelin Luther is concerned, in her individual capacity, the release is plain, unambiguous, and binding as to all tortfeasors." The Court of Appeals applied the rules of contract construction in interpreting the release document. Hence, it placed the burden on Danner and Service Printing, as third parties to the release, to prove that the parties named in the release, Jacquelin, Floyd Sr.'s estate, and Dairyland Insurance, intended to release Danner and Service Printing. The Court of Appeals found the intent of the parties to be apparent in the plain language of the release. Accordingly, the Court of Appeals affirmed the district court's refusing to consider parol or extrinsic evidence for the purpose of ascertaining intent. In support of its rationale, the Court of Appeals cited *In re Cherokee County Revenue Bonds*, 262 Kan. 941, 953, 946 P.2d 83 (1997); *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212 Kan. 35, 42, 510 P.2d 145 (1973); *Eggleston v. State Farm Mut. Auto. Ins. Co.*, 21 Kan. App. 2d 573, 574, 906 P.2d 661, *rev. denied* 257 Kan. 1091 (1995); and a Missouri case.

In *In re Cherokee County Revenue Bonds*, the question before the court involved construing the language of a trust indenture. The court recited the well-known rules of construction that prohibit courts from analyzing contract provisions in isolation and require courts to refrain from interpretation where the language is unambiguous. 262 Kan. at 953. *Fieser* was decided before comparative negligence became law in Kansas. The court disapproved the rule that previously had insulated successive tortfeasors from liability where the injured party had given a general release to the original tortfeasor. The only Kansas case cited that actually supports the Court of Appeals' rationale and conclusion is *Eggleston*. Sharon Eggleston's husband died in an automobile collision. She

settled with one of the drivers and signed a release that released him and all others from all Eggleston's current and future claims. The Court of Appeals affirmed summary judgment in favor of all others involved in the collision on the ground that "the release is clear and all encompassing." 21 Kan. App. 2d at 574.

In justifying the somewhat harsh result, the Court of Appeals revealed that its consideration extended to factors not on the face of the release document: *"Given Eggleston's knowledge* at the time she executed the release, the language of the document expresses an intent to release anyone and everyone involved in the accident. See *Jukes v. North American Van Lines, Inc.*, 181 Kan. 12, 20, 309 P.2d 692 (1957)." (Emphasis added.) 21 Kan. App. 2d at 574. In relying on *Jukes*, the Court of Appeals harked back to the time when Kansas courts applied the concept of joint and several liability. In 1974, the legislature enacted a comparative negligence statute, K.S.A. 60-258a.

"In actions where comparative negligence is in issue the court deals in percentages of causal responsibility, and distinctions between primary, secondary, active and passive negligence lose their previous identities. The nature of misconduct in such cases is to be expressed on the basis of degrees of comparative fault or causation, and the 'all or nothing' concepts are swept aside." *Kennedy v. City of Sawyer*, 228 Kan. 439, Syl. ¶ 6, 618 P.2d 788 (1980).

The "all or nothing" rule of common-law contributory negligence was softened by institution of comparative negligence concepts. 228 Kan. at 450.

A review of current cases from other states' courts reveals that in the construction of general releases, too, the "all or nothing" rule has given way to more tempered approaches. The Supreme Court of New Mexico made a study of general release cases and identified three categories—"flat bar rule," "intent rule," and "specific identity rule" cases. *Hansen v. Ford Motor Co.*, 120 N.M. 203, 207, 900 P.2d 952 (1995). The three were described as follows:

"Those courts adopting the flat bar rule hold that language such as 'all other persons, firms or corporations liable' is unambiguous and discharges all potential tortfeasors from liability. *See, e.g., Battle v. Clanton*, 27 N.C. App. 616, 220 S.E.2d 97, 99 (1975), *cert. denied*, 289 N.C. 613, 223 S.E.2d 391 (1976); *Hasselrode v. Gnagey*, 404 Pa. 549, 172 A.2d 764, 765 (1961). The parties to a general release

containing 'all other persons' language are deemed as a matter of law to have expressed their intent to discharge all potential tortfeasors. Flat bar courts thus look only to the four corners of the release document and do not allow consideration of extrinsic evidence.

"Jurisdictions adopting the intent rule have developed two formulations with similar purposes. Some jurisdictions hold that the parol evidence rule is inapplicable in an action by a party to a release and a stranger to that agreement. *See, e.g., Neves,* 769 P.2d at 1054; *Sims v. Honda Motor Co.,* 225 Conn. 401, 623 A.2d 995, 1003 (1993). Under this formulation of the intent rule, parol evidence of the parties' intentions is admissible even when the terms of the release are facially unambiguous. *See, e.g., Sims,* 623 A.2d at 1004 n.12. Other jurisdictions hold that extrinsic evidence of the parties['] intent is admissible only when the court determines as a matter of law that the terms of the release agreement are ambiguous. *See, e.g., Wells v. Shearson Lehman/Am. Express, Inc.,* 72 N.Y.2d 11, 530 N.Y.S.2d 517, 523-24, 526 N.E.2d 8, 14-15 (1988); *Krauss v. Utah State Dep't of Transp.,* 852 P.2d 1014, 1019-20 (Utah Ct. App.), *cert. denied,* 862 P.2d 1356 (Utah 1993).

"Jurisdictions adopting the specific identity rule conclusively presume that the liability of a party not named or otherwise specifically identified by the terms of the release is not discharged. The specific identity rule compels the settling parties either to name nonsettling tortfeasors, *see, e.g., Young v. State,* 455 P.2d 889, 893 (Alaska 1969), or to include such terms or descriptions as make the identity of the unnamed beneficiaries or the class thereof reasonably apparent, *see, e.g., Aid Ins. Co. v. Davis County,* 426 N.W.2d 631, 633 (Iowa 1988) (holding that terms identifying persons 'in a manner that the parties to the release would know who was to be benefitted' sufficient under specific identity rule); *Pakulski v. Garber,* 6 Ohio St. 3d 252, 452 N.E.2d 1300, 1303 (1983) (holding that release which discharged agents and employees sufficiently identified law firm and individual member thereof who had represented specifically named releasees)." 120 N.M. at 207-08.

According to the New Mexico court, "[a] distinct minority of jurisdictions continues to adhere to the flat bar rule," and the number of courts that have adopted the intent rule is slightly higher than the number of courts choosing the specific identity rule. 120 N.M. at 208.

The New Mexico court adopted a variation on the specific identity rule. In reaching its decision, the New Mexico court analyzed the rationales given by various states' courts for adopting or rejecting one or another rule. 120 N.M. at 208-11.

The flat bar rule has its roots in the common-law "unity of discharge" rule that release of one joint tortfeasor discharges all others. The unity of discharge rule was based on the concept of the

indivisible wrong of joint and several liability. Because each joint tortfeasor was considered to be entirely liable for the harm, release of one was presumed to be in exchange for compensation for the entire harm and release of all joint tortfeasors. 120 N.M. at 208-09.

The flat bar rule has been rejected by a majority of states' courts as comparative fault has replaced the concept of the indivisible wrong. See 120 N.M. at 208-09. In the view of the New Mexico court, an additional reason for rejecting the flat bar rule is that

"[a] tortfeasor who has taken no part in the satisfaction of a plaintiff's claim should not gratuitously benefit from settlement arrangements undertaken at the time and expense of others. Only when the parties to a release intend to discharge the liability of others not parties thereto should the release be given such effect." 120 N.M. at 209.

The specific identity rule springs, at least in part, from Section 4 of the Uniform Contribution Among Tortfeasors Act, 12 U.L.A. 185 (1939), which provides that a "release by the injured person of one joint tortfeasor . . . does not discharge the other tortfeasors *unless the release so provides.*" (Emphasis added.) In ensuring that the incompatible effect of the common-law rule—discharge of noncontributing tortfeasors—is avoided, some courts have narrowly construed the statutory language so that it requires specificity. Hence, the specific identity rule developed as a judicial construction of a uniform law that applies to "two or more persons jointly or severally liable in tort for the same injury." § 1, 12 U.L.A. 185. In addition, courts have equated the abrogation of the unity of discharge rule with adoption of the specific identity rule.

The intent rule emphasizes the contract axiom that the intent of the parties governs. It is seen as a middle ground between the plaintiff-oriented specific identity rule and the defendant-oriented flat bar rule:

"Many [intent-rule] courts have noted that a specific identity rule swings the pendulum too far in favor of plaintiffs; while the common-law release rule often unfairly deprives a plaintiff of a separate cause of action by artificially presuming that the release of one joint tortfeasor releases all others, the specific identity rule artificially presumes that parties who have not included specific names or identifying terminology did not intend to discharge others." 120 N.M. at 210.

The most interesting aspect of the New Mexico court's decision is its rationale for creating a variation on the specific identity and its attributing Kansas law as its model:

"We agree that with the adoption of comparative fault the need to obtain the release of other concurrent tortfeasors has disappeared except for circumstances in which joint and several liability may yet obtain or in which potential indemnitees exist. Even without the release of other concurrent tortfeasors, the settling tortfeasor remains free of further liability both to the plaintiff for damages and to the nonsettling tortfeasors for contribution. *See Wilson*, 100 N.M. at 231, 668 P.2d at 1108. Relying on Kansas' adoption of comparative fault and abrogation of joint and several liability, the Kansas Court of Appeals held that 'the type of release given will have no effect on any party not specifically named in the instrument.' *Geier v. Wikel*, 4 Kan. App. 2d 188, [190,] 603 P.2d 1028, 1030 (1979). The current state of the law has led to our conclusion that boilerplate universal release language is circumstantially ambiguous and serves only to trap unwary plaintiffs into surrendering claims when it is not necessary to do so in order to protect the party with whom they are settling." 120 N.M. at 211.

## The New Mexico Supreme Court further stated:

"We agree with those courts which have observed that adopting a pure specific identity rule entirely ignores the actual intent of the parties to a general release. As we indicated when rejecting the flat bar rule, we should not elevate form over substance. We conclude that sound policy requires more evidence of intent to release potential tortfeasors not named in a release agreement than boilerplate language that objectively purports to release the entire world from liability. . . .

"It is therefore because release agreements are most often drafted by the party seeking to be released, because the attorneys who draft these agreements and the insurance companies they represent are laboring under the influence of a bygone era, and because the victim's interest in obtaining recompense frequently overshadows concerns with boilerplate language that is often introduced for the first time in a release prepared after the specific parties have agreed to a settlement, that we have concluded boilerplate release language like that used here is inherently ambiguous. We hold that a general release raises a rebuttable presumption that only those persons specifically designated by name or by some other specific identifying terminology are discharged. *See Stueve v. American Honda Motors Co.*, 457 F. Supp. 740, 747 (D. Kan. 1978) (applying Kansas law and adopting presumption that third parties not discharged by general release silent as to other tortfeasors). In the absence of such specific terminology, the person seeking to be discharged must prove by extrinsic evidence that the parties to the agreement actually intended to discharge him or her from liability. Such a rule best mitigates the harsh effects of the common-law release rule, insures that injured parties have in fact intentionally released claims against third parties, and works no unfair

hardship on the party negotiating and receiving the release or the prospective third-party beneficiary." 120 N.M. at 211.

The Kansas case and the federal case applying Kansas law that were relied on by the New Mexico court were not cited by the Court of Appeals in the decision that is before us for review. In *Geier v. Wikel*, 4 Kan. App. 2d 188, 603 P.2d 1028 (1979), brothers Ronnie and Randy Geier were riding in a vehicle owned and operated by Steven Wikel when it struck a train. Randy was injured, and Ronnie was killed. Randy and his father received $5,000 from the railroad for Randy's injuries and executed a release. Ronnie's mother and father received $5,000 from the railroad for Ronnie's death and executed a release. Later, Randy sued Wikel for his injuries, and Ronnie's mother and father sued Wikel for wrongful death. The trial court entered summary judgment for Wikel on the theory that the release of one joint tortfeasor releases all. The Court of Appeals vacated the judgment because the concept of joint and several liability no longer applied. Commenting on the current state of the law, the Court of Appeals stated:

"An injured party whose claim for damages is exclusively subject to the Kansas comparative negligence statute may now settle with any person or entity whose fault may have contributed to the injuries without that settlement in any way affecting his or her right to recover from any other party liable under the act. The injured party is entitled to keep the advantage of his or her bargaining, just as he or she must live with an inadequate settlement should the jury determine larger damages or a larger proportion of fault than the injured party anticipated when the settlement was reached. It follows that the type of release given will have no effect on any party not specifically named in the instrument." 4 Kan. App. 2d at 190.

In addition, the Court of Appeals quoted from a similar resolution to a similar question in *Stueve v. American Honda Motors Co., Inc.*, 457 F. Supp. 740, 748-49 (D. Kan. 1978):

" '[S]ince a given defendant in a case governed by K.S.A. 60-258a can be held liable in any event only for that percentage of injury attributable to his fault, a release of that defendant cannot inure to the benefit of potential co-defendants. Under former rules of joint liability, to release one defendant unconditionally may have been viewed as relinquishment of the right to recover one's entire damages from a party liable, and thus as extinguishing the action as to potential defendants

who stand as third-party beneficiaries to the release. This cannot be the case in an action under K.S.A. 60-258a.' " 4 Kan. App. 2d at 190.

In *Stueve*, Frederick Stueve died from burns suffered in a collision of his motorcycle and a car driven by Joseph Witherspoon. Stueve's widow settled with Witherspoon for his policy limit. She filed a product liability action against the motorcycle distributor and manufacturer, alleging defective design of the gas tank. In weighing the motorcycle defendants' claim that the discharge of Witherspoon discharged all others who might have been liable, the federal district court examined a number of Kansas cases, including several already mentioned in this opinion. Although noting that there was language in some Kansas cases that might lead in a different direction, the federal court concluded that the Kansas rule creates a presumption against relinquishment of unspecified rights:

"[I]n *Jukes v. North American Van Lines, Inc.*, 181 Kan. 12, 309 P.2d 692 (1957), the Kansas court stated that 'in order for a release of one to bar actions against others, a release or covenant not to sue must be a general one, which clearly shows the intention to release all parties.' *Id.*, 181 Kan. at 20, 309 P.2d at 699. This rule was restated in *Milwaukee Insurance Co. v. Gas Service Co.*, 185 Kan. 604, 347 P.2d 394 (1959). Finally, in *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212 Kan. 35, 510 P.2d 145 (1973), the Kansas court ruled that when a release is given which neither expressly releases nor expressly reserves rights against third parties, the burden is upon the third parties to demonstrate that their release was intended. *Id.*, 212 Kan. at 41-42, 510 P.2d 145. Thus we believe that in the absence of any evidence produced by either party on the question of intent, and when the document is silent upon the matter, the Kansas rule is that other parties are 'presumed' not released." 457 F. Supp. at 747.

Applying this rule to the facts of the case before it, the federal court denied the defendants' motion for summary judgment. 457 F. Supp. at 747.

We agree with the New Mexico court's reading of the *Geier* and *Stueve* courts' application of Kansas law. Once comparative fault principles replaced those of joint and several liability, the earlier rule that "boilerplate universal release language" could extinguish rights no longer fit the theory of wrongdoing. Because the boilerplate language continued to appear in release instruments, our courts formulated an approach that harmonizes with the current tort theory. The approach, moreover, affords protection to the set-

tling party by creating a presumption against wholesale discharge and affords protection to the nonsettling tortfeasors by making it rebuttable.

In the present case, the district court granted summary judgment to Danner and Service Printing on the ground that "[t]he Release is clear and unambiguous and clearly releases all Defendants." In contrast, the New Mexico court viewed release boilerplate as inherently ambiguous, and there is much to recommend the view of that court. In any event, under the rule set forth in previous Kansas cases, because Danner and Service Printing were not identified in the release by name or other specific identifying terminology, there is a rebuttable presumption that their release was not intended. They must bear the burden of rebutting the presumption. Because the district court and the Court of Appeals in affirming the entry of summary judgment in favor of Danner and Service Printing failed to follow the approach that is consistent with comparative fault principles, the decision must be reversed and remanded.

The judgment of the Court of Appeals affirming the district court's entry of summary judgment as to Jacquelin's wrongful death action is reversed, and the judgment of the district court is reversed. The case is remanded to the district court for further proceedings consistent with this opinion.