(6 P.3d 918)
No. 83,474

STEVEN E. ANDERSON, *Appellee*, v. EMPLOYERS MUTUAL
CASUALTY INSURANCE COMPANY, *Appellant*.

Opinion filed June 9, 2000.

*Steve R. Fabert* and *J. Steven Pigg*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellant.

*Norman G. Manley*, of Davis & Manley, of El Dorado, for appellee.

Before RULON, P.J., GREEN, J., and WAHL, S.J.

RULON, J.: Defendant Employers Mutual Casualty Insurance Company appeals the district court's denial of its motion for a directed verdict on the issues of fault and release. The defendant additionally appeals the district court's calculation of the offsets from the jury's damage award. We affirm.

On January 2, 1996, the plaintiff, Steven E. Anderson, was returning home from some work-related errands, driving eastbound on 101st Street in Sedgwick County. As the plaintiff approached a small rise in the road, the headlights of an oncoming car, driven by Joya Willits, appeared over the crest of the hill. Willits' car did not fishtail or swerve but directly entered the plaintiff's lane of traffic. As the plaintiff attempted to avoid an accident, he noticed

the road conditions were slippery. Plaintiff managed to steer his vehicle to the right and onto the shoulder of the road but was unable to avoid a collision with the oncoming vehicle.

Due to the impact, the plaintiff's head went through the driver's side window, inflicting a concussion and splitting the plaintiff's earlobe, and his right hand was injured. The impact caused minor spinal injury to the plaintiff's lower back. The plaintiff broke his right kneecap and both of his ankles. Plaintiff's right ankle is permanently damaged. Although most of the plaintiff's injuries have healed, he can no longer stand for long periods of time due to the pain in his right ankle.

Because the plaintiff was bedridden for several weeks and due to his disability arising from his ankle injury, he decided that he could no longer maintain his engineering business and began to convert his business into a surveying firm. The plaintiff purchased some new equipment that would enable him to remain competitive with other surveyors despite his inability to stand for long periods of time.

Eventually, the plaintiff entered discussions about liability with Willits' insurance carrier. On March 14, 1996, Willits' insurance carrier tendered the policy limit of $50,000 on Willits' insurance policy in exchange for the plaintiff's waiver of underinsured subrogation rights from the plaintiff's underinsured motorist insurance policy.

The plaintiff, on March 19, 1996, wrote to the defendant, informing the defendant of the settlement offer and requesting the defendant to substitute payment within 60 days. Otherwise, the plaintiff expressed his intent to accept the settlement and execute a release.

When the defendant failed to respond by May 20, 1996, the plaintiff wrote a letter to Willits' insurance carrier to notify it of the plaintiff's intention to proceed with the settlement. On the same date, the plaintiff notified the defendant that he was proceeding with the settlement offer.

Willits' insurance carrier tendered the plaintiff a check for $50,000 and a release form, which was signed on June 7, 1996.

On October 1, 1997, the plaintiff obtained a workers compensation award of $56,589.10, which was applied to medical costs incurred by the plaintiff, and an award of $14,856.60 for lost wages. After the Workers Compensation Board affirmed the administrative law judge's decision, the plaintiff turned over the proceeds of his settlement award to his workers compensation carrier to reimburse that insurer for medical disbursements made to cover the plaintiff's medical bills.

On October 6, 1997, the plaintiff filed the present action against the defendant for refusing to compensate the plaintiff for the remainder of the costs associated with the accident under plaintiff's underinsured motorist insurance policy.

On February 4, 1998, the defendant moved for summary judgment, arguing the plaintiff had signed a general release without reserving the right to pursue underinsured motorist benefits. According to the defendant, the defendant is released from any liability arising from the tortfeasor's inability to pay the plaintiff's costs. The motion was denied.

After a trial on the merits, the defendant sought a directed verdict on the release issue and further argued the plaintiff had failed to prove that Willits' fault had caused the accident. The district court denied both motions.

The jury allocated damages to the plaintiff in the amount of $198,000. However, the jury determined the plaintiff was 5% at fault in the accident and allocated Willits with 95% of the liability. *The jury was not asked to consider the amount of medical damages the plaintiff was entitled to receive and was specifically instructed not to consider medical costs associated with the accident.*

Ultimately, the district court considered what disbursements received by the plaintiff should offset the jury award against the defendant. The parties agreed the award should be reduced by the 5% of fault attributed to the plaintiff. The plaintiff additionally conceded the award should be reduced by the $14,865 paid by his workers compensation carrier to replace the plaintiff's lost wages.

The defendant first argued the plaintiff's insurance policy excludes duplicative payments of entire categories of damages rather than merely duplicative payments of actual payments made, as au-

thorized in K.S.A. 40-284. The defendant argued the jury award should be reduced by the $56,000 of workers compensation benefits received to pay for the defendant's medical treatment. Finally, the defendant argued that underinsured motorist benefits do not apply to amounts exceeding the liability limits of the underinsured motorist's liability policy. According to the defendant, the jury award should be reduced by $50,000 as well.

The district court refused to accept any of the additional arguments made by the defendant and awarded the plaintiff $173,234.40 of the original jury verdict.

## THE RELEASE

The defendant's primary basis for appeal lies in its argument that the plaintiff released the defendant from liability. The defendant contends the general release of liability executed by the plaintiff in exchange for Willits' insurance policy liability limits contained no reservation of rights to proceed against the defendant for underinsured motorist compensation. Because the release is unambiguous, the defendant claims, the plaintiff cannot now seek to avoid the terms of the release which the plaintiff authored.

In response, the plaintiff contends the defendant is estopped from escaping liability under the release because the defendant waived its right to participate in the settlement between the plaintiff and Willits' insurer. The plaintiff argues the defendant's failure to respond when the plaintiff notified the defendant of the tentative settlement agreement, under K.S.A. 40-284(f), bars the defendant from now raising the settlement agreement and the accompanying release as a defense to liability under the plaintiff's underinsured motorist policy.

The plaintiff's argument calls for construction of K.S.A. 40-284(f). Interpretation of a statute is a question of law, over which this court has unlimited review. See *State v. Patterson*, 25 Kan. App. 2d 245, 247, 963 P.2d 436, *rev. denied* 265 Kan. 888 (1998).

K.S.A. 40-284 establishes the rights and obligations of underinsured motorist insurance carriers. This statute clearly allows an underinsured motorist insurance carrier who pays on a claim by its insured to maintain a subrogation action against any tortfeasor or

other primarily responsible parties. K.S.A. 40-284(f). However, the insurer's right to proceed against the primarily responsible party or parties is derivative from the rights of its injured insured. Consequently, if the insured executes a release of liability in favor of any primarily responsible party, the insurer's right to subrogation is necessarily impaired.

To balance the insured's need for a speedy resolution of liability and compensation for injuries with the insurer's right to reimbursement from the primarily responsible parties for payment made under an underinsured motorist policy, the legislature devised a procedure designed to provide the underinsured motorist insurer with notice of a potential settlement between its insured and any primarily responsible parties. See K.S.A. 40-284(f).

K.S.A. 40-284(f) requires an underinsured motorist insured to provide written notice to the underinsured motorist insurer of a tentative settlement. Once the insurer receives notice of the settlement offer, it has 60 days within which to either approve the settlement, knowingly impairing its right to subrogation, or tender substitute payment of the amount offered in the settlement offer to preserve its right to subrogation. See *Dalke v. Allstate Ins. Co.*, 23 Kan. App. 2d 742, 749, 935 P.2d 1067, *rev. denied* 262 Kan. 960 (1997). The penalty for failing to respond within the 60-day period is that the insurer cannot deny the insured underinsured motorist benefits if the insured impairs the insurer's subrogation rights by executing a release in accepting a settlement offer.

Here, the record is undisputed that the plaintiff complied with K.S.A. 40-284(f) in notifying the defendant of the Willits' settlement offer. Furthermore, the defendant does not contest the plaintiff's allegations that defendant failed to respond to the plaintiff's notice within the statutorily allotted time. Consequently, if the only issue on this appeal concerned whether the plaintiff improperly impaired the defendant's right of subrogation, this court would have no difficulty in affirming the judgment in favor of the plaintiff.

However, the defendant attempts to distinguish an impairment of its right to subrogation from a release of liability. The defendant argues that by executing a general release, the plaintiff released the defendant from liability as well as the primarily responsible

parties. The defendant contends that its avoidance of payment is derived through the operation of contract as opposed to statute.

An appellate court may independently construe a written agreement to determine its legal significance. See *Boos v. National Fed'n of State High School Ass'ns*, 20 Kan. App. 2d 517, 522, 889 P.2d 797 (1995). Furthermore, where a written agreement is plain and unambiguous, the appellate court must not look beyond the four corners of the document to give effect to the intent of the parties. See *In re Cherokee County Revenue Bonds*, 262 Kan. 941, 953, 946 P.2d 83 (1997).

The pertinent language of the release provided:

"[The $50,000 check] is accepted in full compromise settlement and satisfaction of and as sole consideration of the final release and discharge of all actions, claims, causes of action and demands whatsoever that now exist, or may hereafter accrue, against David A. Willits, Joya Willits, driver and all others, and any other person, corporation, association, partnership or entity charged with responsibility for injuries to the person and property of the Undersigned, and the treatment thereof and the consequences flowing therefrom, as a result of an accident, casualty or event which occurred on or about the 2nd day of January, 1996 at or near Sedgwick County, Kansas and for which the Undersigned claim(s) the above named persons or parties are legally liable in damages; which legal liability and damages are disputed and denied. The Undersigned agree(s) that this Release shall apply to all unknown and unanticipated injuries and damages resulting from said accident, casualty or event as well as those now disclosed . . . ."

In *Eggleston v. State Farm Mut. Auto. Ins. Co.*, 21 Kan. App. 2d 573, 574, 906 P.2d 661, *rev. denied* 257 Kan. 1091 (1995), this court addressed the effect of a release under similar circumstances. In *Eggleston*, the plaintiff was suing for the wrongful death of her husband, who had been killed in an automobile accident. After settling with one of the drivers, the plaintiff brought suit against the owners of the car her husband was driving, their underinsured motorist insurance carrier, and her underinsured motorist insurance carrier.

The release executed by Eggleston in favor of the other driver included language very similar to the language of the release executed by the plaintiff in the present case, releasing " 'all other persons, firms, corporations' " from " 'any and all claims.' " 21 Kan. App. 2d at 574. The *Eggleston* court held that such broad language

released not only the underinsured motorist insurance carriers but also the owners of the vehicle driven by the deceased. 21 Kan. App. 2d at 574.

Recently, however, our Supreme Court disapproved of the strict interpretation of releases advocated by *Eggleston*. See *Luther v. Danner*, 268 Kan. 343, 346, 995 P.2d 865 (2000). Although *Luther* did not involve underinsured motorist coverage, the court considered whether a general release barred claims of the plaintiffs against tortfeasors not specifically enumerated in the release. *Luther*, 268 Kan. at 344.

Our Supreme Court concluded that with the adoption of comparative negligence, courts began to adopt a more liberal view of the boilerplate language within standard release agreements.

"Once comparative fault principles replaced those of joint and several liability, the earlier rule that 'boilerplate universal release language' could extinguish rights no longer fit the theory of wrongdoing. Because the boilerplate language continued to appear in release instruments, our courts formulated an approach that harmonizes with the current tort theory. The approach, moreover, affords protection to the settling party by creating a presumption against wholesale discharge and affords protection to the nonsettling tortfeasors by making it rebuttable." *Luther*, 268 Kan. at 352.

There is no persuasive argument that the reasoning of *Luther* should not apply under the circumstances present here. The release executed by the plaintiff clearly contained boilerplate provisions regarding which parties were to be relieved of liability. The only specific parties mentioned in the settlement agreement were David and Joya Willits. Following *Luther*, the plaintiff here released only the Willits from liability, not plaintiff's underinsured motorist insurance carrier.

The defendant argues that parol evidence in the form of affidavits from Steve R. Fabert and Robert Fisher demonstrate that the plaintiff intended to release all parties to the contract. Unfortunately, the record does not substantiate the defendant's position.

The plaintiff's counsel, Norman G. Manley, filed an affidavit expressing his clear intent at the time of executing the release to reserve the plaintiff's rights to pursue compensation under the underinsured motorist policy. Such intent is further supported by the

notice letters sent to the defendant by the plaintiff. Such correspondence clearly indicate the plaintiff's attempt to comply with the statutory notice requirements to enable the plaintiff to preserve his insurance benefits after settling with the Willits' insurer. Arguably, the most persuasive evidence is the final affidavit of Robert Fisher. The affidavit relied upon by the defendant was merely a draft version, which counsel for the defense admits was later disclaimed. In the final version, Fisher stated he knew the plaintiff intended to reserve his rights against his underinsured motorist insurance carrier. Fisher testified as follows:

"It was never my intent or the intent of my company to extract from Mr. Anderson a release or relinquishment of his IUM claim. Nor was it my intent that the release serve such a purpose. That was a matter to be resolved between Mr. Anderson and EMC and was not our concern other than to assure that when the UIM claim was made that it would not affect my insured or my company."

In light of the overwhelming evidence, the plaintiff clearly did not release the defendant from its obligation to compensate the plaintiff's injuries. Under the reasoning of *Luther*, the defendant cannot rebut the presumption that the release was executed solely in favor of the Willits. Even if the district court relied upon an erroneous interpretation of K.S.A. 40-284(f) in refusing to grant the defendant's motions for summary judgment and directed verdict on the issue of the release, the judgment was correct and is affirmed. See *Soto v. State*, 23 Kan. App. 2d 85, 90, 927 P.2d 954 (1996).

## PROOF OF FAULT

The defendant challenges the district court's refusal to direct a verdict on the issue of Willits' fault. The defendant claims the plaintiff failed to prove that Willits' fault caused the accident resulting in the plaintiff's injuries.

"In ruling on a motion for directed verdict . . . the court is required to resolve all facts and inferences to be drawn from the evidence in favor of the party against whom the ruling is sought and, where reasonable minds could reach different conclusions based on the evidence, the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict. [Citation omitted.]" *Reeves v. Carlson*, 266 Kan. 310, 313, 969 P.2d 252 (1998).

The defendant cites *Bottjer v. Hammond*, 200 Kan. 327, 436 P.2d 882 (1968), to support its allegation that the plaintiff failed to prove Willits' negligence was the cause of the collision rather than weather conditions.

In *Bottjer*, the district court ruled that Bottjer had failed to demonstrate that Hammond had been negligent in hitting Bottjer with her car. The evidence of negligence was limited to Hammond's testimony that she did not see Bottjer before the accident but only heard something strike the side of the car as she drove past the crosswalk. The *Bottjer* court held that the only reasonable inference to be drawn from this testimony was that the plaintiff walked into the side of the car as it drove by the crosswalk. This did not prove negligence. 200 Kan. at 329-30.

In contrast, here, the only evidence concerning the possible causes of the collision was elicited from the plaintiff and Officer Sims. Officer Sims admitted the road was icy by the time he arrived at the accident scene. However, Sims testified the weather conditions were not severe enough to cause a vehicle to stray across the center line of the road. The plaintiff *not only refused* to admit the roads were hazardous due to ice but refuted the inference raised by defense counsel that Willits' car was blown across the center line by a sudden gap in a wind break. Plaintiff testified the wind was not a factor because the wind breaks were not near the collision scene. Furthermore, the plaintiff testified that Willits made no attempt to pull back into the proper lane but directed her car straight into the plaintiff's lane.

Based upon this testimony, a reasonable juror was left with the unrefuted evidence that weather conditions did not play a substantial part in the accident but that Willits crossed over the center line as she came over the crest of a hill without swerving or attempting to pull her vehicle into the correct lane and collided with the plaintiff's vehicle. We are satisfied the jury determined that Willits' negligence was the sole cause of the accident, not unavoidable conditions of the road.

However, the defendant contends the jury failed to consider the effect of ice because the district court refused to give an instruction on slipping on ice. The defendant contends that, had the district

court instructed the jury on the effect of ice, the jury would likely have returned a different verdict.

Clearly, a district court must instruct the jury upon a party's theory of the case, and failure to do so is reversible error where the party is prejudiced. However, the instructions are to be considered together, and, if, when read together, the instructions fairly instruct the jury on the law governing the case without misleading the jury, any error in the instructions will be deemed harmless upon review. See *Hawkinson v. Bennett*, 265 Kan. 564, 577-78, 962 P.2d 445 (1998).

In requesting an instruction on ice, the defendant relied on *Wilson v. Rushton*, 199 Kan. 659, 664, 433 P.2d 444 (1967). In *Wilson*, the defendant moved for a directed verdict on the basis that the accident was caused solely by ice, which the district court granted. Our Supreme Court affirmed, concluding the facts did not support a finding of negligence.

" 'It is generally held that the mere fact that a motor vehicle skids on a slippery pavement does not of itself constitute such evidence of negligence upon the driver's part as to render the doctrine of res ipsa loquitur applicable. Skidding is not generally an occurrence of such uncommon or unusual character that, unexplained, it furnishes evidence of the motorist's negligence. However, the doctrine is applicable where the circumstances are such as to give rise to an inference of negligence on the part of the driver of the skidding vehicle.' " 199 Kan. at 664 (quoting 8 Am. Jur. 2d, Automobiles and Highway Traffic § 929, pp. 477-78).

Although the *Wilson* court concluded that skidding on an icy road does not establish negligence through *res ipsa loquitur*, nothing in that opinion indicates a driver can never be found guilty of negligence in the presence of ice.

Here, the evidence presented before the district court tends to erode the defendant's argument that icy road conditions were the sole cause of the accident. Both the plaintiff and the officer testified they had no difficulty controlling their vehicles. The plaintiff reported that Willits' vehicle did not fishtail or demonstrate any other signs that Willits was having difficulty controlling her vehicle. The plaintiff opined that wind was not a factor that would cause Willits to cross the center line.

Moreover, the jury instructions issued by the district court required the jury to determine whether Willits was at fault in the accident. The district court defined "fault" as negligence which caused or contributed to the plaintiff's injuries. "Negligence" was defined as lack of ordinary care under all the circumstances then existing. The court set forth the allegations of fault that each party was required to prove and instructed the jury on each of the allegations. Such instructions fairly state the law of negligence and, indeed, differ only insubstantially from the law of negligence set forth by our Supreme Court in *Wilson*, upon which the defendant so heavily relies. See 199 Kan. at 663 (quoting *Lamb v. Hartford Accident & Indemnity Co.*, 180 Kan. 157, 161, 300 P.2d 387 [1956]).

We are firmly convinced the district court did not commit reversible error in denying the defendant's requested instruction on icy road conditions.

## CALCULATIONS OF DAMAGES

Finally, the defendant challenges the district court's calculation of offsets to be deducted from the jury award.

In calculating the defendant's damages, the district court specifically found the plaintiff *had omitted* any claim for medical expenses and the jury *had not* returned a verdict for damages associated with medical expenses. Accepting the jury's award of $198,000, the court reduced the damage award by the 5% fault assessed by the jury against the plaintiff, which yielded a total of $188,100. The court further subtracted the amount of workers compensation benefits paid to the plaintiff for lost wages, resulting in a total of $173,234.40.

The defendant now claims the district court erred in instructing the jury to disregard damages regarding medical costs. While the defendant, in post-trial motions, protested that the defendant never acceded to the plaintiff's position to eliminate the medical costs from the jury's consideration of damages, the record clearly reflects that the defendant failed to make a timely and specific objection to the instruction which removed such consideration from the jury. In fact, the defendant pointed out an inconsistency

in the instructions concerning whether the damages the jury was to assess included medical costs. When the district court suggested changing the inconsistent instruction to exclude medical costs, the defendant approved the change.

"A party may not assign as error the giving or failure to give an instruction unless the party objects before the jury retires to consider its verdict. The objection must distinctly state the matter to which the party objects and the grounds for such objection unless the instruction is clearly erroneous. [Citation omitted.]" *Bright v. Cargill, Inc.*, 251 Kan. 387, 409, 837 P.2d 348 (1992).

The defendant claims the instruction removing medical costs from the jury's damage consideration led to an erroneous calculation of the total damages suffered by the plaintiff.

" 'Where a trial court has fashioned a remedy to make the injured party whole, the test on appellate review is not whether the remedy is the best remedy that could have been devised, but whether the remedy so fashioned is erroneous as a matter of law or constitutes a breach of trial court discretion.' " *Southwestern Business Systems, Inc. v. Western Kansas Xpress, Inc.*, 19 Kan. App. 2d 861, 867, 878 P.2d 833, *rev. denied* 255 Kan. 1003 (1994) (quoting *Gillespie v. Seymour*, 250 Kan. 123, Syl. ¶ 10, 823 P.2d 782 [1991]).

Here, the parties stipulated the plaintiff's workers compensation insurer had paid the medical costs incurred by the plaintiff and would pay any future medical expenses. Additionally, K.S.A. 40-284(e)(4) provides an exclusion for underinsured motorist benefits to the extent that such costs are paid by workers compensation.

Because the workers compensation benefits entirely compensated the plaintiff's medical expenses and because the plaintiff's underinsured motorist policy excluded workers compensation benefits from the amount the defendant was to pay under the policy, any medical costs associated with the plaintiff's injuries from this accident would have been deducted from the total damage award. Therefore, even if the jury considered and awarded the plaintiff his medical costs along with the other damages assessed against the defendant, the amount of damages for which the plaintiff had not been compensated remains unaltered.

The defendant claims that, had the jury considered the medical costs and awarded damages for the plaintiff's medical expenses, the jury might have reduced the award of damages in another cat-

egory. However, a jury is presumed to have followed the district court's instructions in assessing damages. See *Kuhl v. Atchison, Topeka & Santa Fe Rwy. Co.*, 250 Kan. 332, 348, 827 P.2d 1 (1992). This court will not second-guess the jury's motives in assessing other categories of damages based solely upon the defendant's conjecture.

The district court fully supported its reasoning by calculating the total damages assessed in favor of the plaintiff and determining whether the jury's award against the defendant caused an overpayment to the plaintiff. In doing so, the district court added the amount already paid by the workers compensation insurer to the damages awarded by the jury. Then, the district court subtracted the payments received by the plaintiff, minus the $50,000 settlement award, which was to reimburse the workers compensation insurer and, thus, duplicative of the workers compensation award. The amount of damages assessed against the defendant remained unchanged.

Furthermore, the defendant's claim that the jury's verdict exceeded the total amount of the plaintiff's damages is without merit.

Briefly said, a thorough review of the damages demonstrates the district court's calculation was not clearly erroneous.

Next, the defendant claims the district court erred in refusing to deduct the liability limit under Willits' insurance policy before attaching proceeds under the plaintiff's underinsured motorist policy to compensate for his losses.

K.S.A. 40-284(b) provides:

"Any uninsured motorist coverage shall include an underinsured motorist provision which enables the insured or the insured's legal representative to recover from the insurer the amount of damages for bodily injury or death to which the insured is legally entitled from the owner or operator of another motor vehicle with coverage limits equal to the limits of liability provided by such uninsured motorist coverage to the extent such coverage exceeds the limits of the bodily injury coverage carried by the owner or operator of the other motor vehicle."

There is no question that plaintiff's injuries exceeded the liability limits of Willits' insurance policy. Moreover, there is no question the amount the plaintiff received from Willits' liability insurer was directed to reimburse the workers compensation insurer. The only

question is whether the defendant may deduct the amount of that liability limit from the amount owed the plaintiff under the underinsured motorist policy.

In *Kilner v. State Farm. Mut. Auto. Ins. Co.*, 252 Kan. 675, 686, 847 P.2d 1292 (1993), our Supreme Court first considered whether an underinsured motorist insurance carrier was entitled to a dollar-for-dollar setoff of workers compensation benefits against the amount it was required to pay its insured. The *Kilner* court held that K.S.A. 40-284(e) provided a reduction of payment under an underinsured motorist policy only to the extent that the payments were duplicative of other forms of payments specifically enumerated within the statute. 252 Kan. at 686.

In *Fisher v. State Farm Mut. Auto. Ins. Co.*, 264 Kan. 111, 123-24, 955 P.2d 622 (1998), our Supreme Court reaffirmed its position in *Kilner* under circumstances in which the plaintiff's receipts would exceed the amount of damages the jury assessed at trial.

Because the amount received from Willits' insurer was applied to reimburse the workers compensation insurer for its payment of medical costs, as required by law, the defendant cannot now take a reduction in damages for the amount of Willits' liability insurance limits. To do so would enable underinsured motorist insurers to effectively deduct payments twice: once for compensation provided by workers compensation to the extent that it duplicated payments by the underinsured motorist policy and once for compensation available by the limits of the tortfeasor's liability insurer.

The defendant cites *Allied Mut. Ins. Co. v. Gordon*, 248 Kan. 715, 725-28, 811 P.2d 1112 (1991), to support its contention that Willits' liability limit should be deducted from the damage award, despite the workers compensation lien on the settlement proceeds. However, *Gordon* is distinguishable from the circumstances presented here.

In *Gordon*, the underinsured motorist policy limit was $100,000. Harding, the injured party and underinsured motorist policy holder, sustained damages in an automobile accident primarily caused by Gordon. The jury awarded Harding $200,000, allocating 90% of the fault to Gordon. As such, Gordon's liability was $180,000. Gordon paid $60,000 to Harding, and Harding sought

compensation under his underinsured motorist policy. After deducting the workers compensation awards that Harding had already received, the district court concluded that Harding's outstanding damages were approximately $100,000. The district court refused to deduct Gordon's liability limits from the amount of underinsured motorist benefits Harding could seek, reasoning that Harding never received that amount because it was applied to a workers compensation lien.

In remanding the case for a recalculation of damages payable by the underinsured motorist insurer, our Supreme Court considered the liability limits of the underinsured motorist policy, which were $100,000. The court then applied the language of K.S.A. 40-284(b) to deduct the liability limits of the tortfeasor's insurance policy, which were $60,000. This left $40,000 of underinsured motorist benefits from which to satisfy the remaining $120,000 in damages for which Gordon was liable to Harding. Therefore, the court amended the judgment to award Harding $40,000. 248 Kan. at 735.

Here, the jury allocated 95% of the fault of the collision to Willits. The total amount of the plaintiff's damages was $254,584.10. Willits' liability was $241,859.64 (after subtracting the 5% of the damage award attributed to the plaintiff's negligence). The plaintiff had an underinsured motorist policy limit of $500,000. After deducting Willits' policy limits, $450,000 of underinsured motorist benefits remained to satisfy any nonduplicative damages. This coverage more than adequately satisfies the district court's judgment against the defendant for $173,234.40.

In conclusion, the district court did not err in refusing to deduct the amount of Willits' liability limits from the jury's award against the defendant. Additionally, the court properly refused to permit the defendant to deduct from the jury award the medical costs which were not considered by the jury.

Affirmed.